DALLEY v DYKEMA GOSSETT PLLC

Docket No. 289046. Submitted January 5, 2010, at Grand Rapids. Decided February 11, 2010, at 9:00 a.m.

H. Scott Dalley brought an action in the Kent Circuit Court, Paul J. Sullivan, J., against Dykema Gossett P.L.L.C., John Ferroli, a Dykema employee, Guidance Software, Inc., and Lincoln National Life Insurance Company and Lincoln Financial Advisors Corporation (collectively Lincoln), alleging five intentional tort claims resulting from the defendants' conduct in gaining entry into plaintiff's apartment and copying the data from all plaintiff's computers while serving plaintiff a temporary restraining order (TRO) entered in the United States District Court for the Western District of Michigan in an action brought by Lincoln against Rodney Ellis, a Lincoln agent, and Lucasse, Ellis, Inc. Dykema Gossett and Ferroli represented Lincoln in the federal court action. The five tort claims included invasion of privacy in the form of intrusion on seclusion or into private affairs, trespass, intentional or reckless infliction of emotional distress, abuse of process, and tortious interference with business relationships or expectancies. The trial court granted defendants' motions for summary disposition and dismissed plaintiff's complaint. Plaintiff appealed.

The Court of Appeals *held*:

1. Plaintiff adequately set forth a claim of invasion of privacy by intrusion on seclusion. The language of the TRO did not render unenforceable plaintiff's claim of intrusion on seclusion. Defendants and plaintiff shared no special relationship, business or otherwise, and defendants possessed no legitimate interest in viewing plaintiff's apartment or copying his computer data unrelated to Lincoln. The circuit court erroneously concluded that the TRO divested plaintiff of his right to privacy in his apartment and computer hard drives. The TRO afforded defendants no right whatsoever to enter or search plaintiffs' apartment or copy personal computer data unrelated to Lincoln. There is no support for the circuit court's conclusion that defendants "had a right to copy hard drives that were potential sources of Lincoln information."

2. The circumstances surrounding defendants' entry into plaintiff's apartment and the copying of his computer hard drives

reasonably suggest that defendants' artifice and dishonesty enticed plaintiff's consent. Factual questions on which reasonable minds could differ exist with respect to whether defendants gained admission to plaintiff's apartment by deceit or exceeded the scope of the consent plaintiff extended. As alleged by plaintiff, defendants' entry of plaintiff's apartment under false pretenses and their disregard of his instructions about the location of the Lincoln-related information they desired could be found objectionable by a reasonable juror. Irrespective of whether defendants ever viewed the copied information, plaintiff's amended complaint adequately pleaded an invasion of plaintiff's seclusion and the trial court improperly granted summary disposition of this claim in favor of defendants.

3. The circuit court's conclusion that the language of the TRO contemplated or authorized an entry into plaintiff's apartment is unfounded. The averments in plaintiff's amended complaint adequately delineate a trespass claim and defendants' alleged misrepresentations could reasonably be found to have vitiated plaintiff's consent to the entry of his apartment. The circuit court erred by granting summary disposition of the trespass claim in favor of defendants.

4. Defendants' actions did not amount to atrocious or extreme behavior and did not rise to the level of outrageousness necessary to establish a claim of intentional infliction of emotional distress. The trial court correctly dismissed this claim.

5. The trial court properly determined that plaintiff did not identify an act or facts supporting the allegation that defendants used the TRO for an improper collateral purpose. The case must be remanded to the circuit court and plaintiff must be afforded an opportunity to amend his complaint pursuant to MCR 2.116(I)(5) to set forth his abuse of process claim in greater detail.

6. The plaintiff failed to allege an act of improper interference by defendants sufficient to allow him to maintain his claim of tortious interference with a business relationship or expectancy. Summary disposition of this claim was properly granted in favor of defendants.

Affirmed in part, reversed in part, and remanded.

1. TORTS — INVASION OF PRIVACY — INTRUSION UPON SECLUSION.

The three elements necessary to establish a prima facie case of intrusion upon seclusion are the existence of a secret and private subject matter, a right possessed by the plaintiff to keep that subject matter private, and the obtaining of information about that subject matter through some method objectionable to a reasonable person;

such an action focuses on the manner in which the information was obtained, not on the information's publication.

2. Torts — Invasion of Privacy — Intrusion Upon Seclusion — Consent to Intrusion.

There can be no invasion of privacy under the theory of intrusion upon the seclusion of the plaintiff if the plaintiff consented to the defendant's intrusion; the scope of a waiver or consent generally will present a question of fact for the jury.

3. Torts — Intentional Infliction of Emotional Distress.

A plaintiff, to establish a prima facie claim of intentional infliction of emotional distress, must present evidence of the defendant's extreme and outrageous conduct, the defendant's intent or recklessness, causation, and the severe emotional distress of the plaintiff; liability will attach only if the plaintiff demonstrates that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

4. Torts — Abuse of Process.

An action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue.

5. Torts — Interference With a Business Relationship.

The elements of a claim of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff; the plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification to fulfill the third element and must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference to establish that the defendant's conduct lacked justification and showed malice; where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.

*Kreis, Enderle, Hudgins & Borsos, PC* (by *Sean P. Fitzgerald*), and *Fossi & Jewell* (by *Karen Jewell* and *Lawrence J. Fossi*) for plaintiff.

*Smith Haughey Rice & Roegge* (by *Jon D. Vander Ploeg, Charles F. Behler,* and *John R. Oostema*) for Dykema Gossett PLLC, John Ferroli, and Guidance Software, Inc.

*Barnes & Thornburg LLP* (by *Jeffrey G. Muth*) and *Chittenden, Murday & Novotny LLC* (by *Donald A. Murday, David J. Novotny,* and *Vittorio F. Terrizzi*) for Lincoln National Life Insurance Company and Lincoln Financial Advisors Corporation.

Before: STEPHENS, P.J., and GLEICHER and M. J. KELLY, JJ.

GLEICHER, J. In this action alleging several intentional torts, plaintiff, H. Scott Dalley, appeals as of right a circuit court order granting defendants summary disposition pursuant to MCR 2.116(C)(8). We affirm in part, reverse in part, and remand for further proceedings.

I. FACTS AND UNDERLYING PROCEEDINGS

A. THE FEDERAL CASE

This case finds its genesis in a dispute between an insurance company and its agent. On April 13, 2004, defendants Lincoln National Life Insurance Company and Lincoln Financial Advisors Corporation (collectively Lincoln) sued Rodney Ellis, a Lincoln agent, and Lucasse, Ellis, Inc. (Lucasse), a company partially owned by Ellis, in the United States District Court for the Western District of Michigan. Lincoln's federal court complaint alleged fraud, breach of fiduciary duty, conversion, breach of contract, and tortious interference with business expectancies or relations. Defen-

dants Dykema Gossett P.L.L.C. (Dykema) and John
Ferroli, a Dykema member, represented Lincoln in the
federal court action.

On April 15, 2004, a federal judge entered a tempo-
rary restraining order (TRO) prohibiting Ellis, Lucasse,
and instant plaintiff Dalley from "deleting, erasing,
destroying, shredding, secreting, removing, modifying,
overwriting, replacing, or 'wiping' " any computer data
or files containing information related to Lincoln's
customers and financial records. The paragraphs of the
TRO directly relevant to plaintiff's present intentional
tort action provide as follows:

> 9. Rodney D. Ellis and Lucasse, Ellis, Inc., all officers,
> owners, employees, principals, and agents of either of them
> who receive actual notice of this Order by personal service
> or otherwise, including but not limited to H. Scott Dalley,
> and all persons or entities acting in concert with any of
> them, are hereby ordered immediately upon service of this
> order to make available to a computer/data consultant
> retained by Plaintiffs all hard drives and other magnetic,
> optical or electronic media in the possession, custody, or
> control of any of them, including those hard drives and
> other magnetic, optical, or electronic media that they have
> the effective power to obtain, which contain any Lincoln
> Customer Records, for prompt non-destructive copying at
> Plaintiffs' expense. Plaintiffs shall minimize disruption to
> the producing person's business to the extent practicable.
> Plaintiffs shall return all hard drives and other magnetic,
> optical, or electronic media supplied pursuant to this Order
> within 24 hours, or such longer time as may be stipulated
> to or ordered by this Court. Plaintiffs' computer consultant
> shall maintain the copied data in a secure, locked location,
> and shall not review or inspect the data copied, or show it
> to Plaintiffs or their attorneys, until further order of this
> Court.
>
> 10. Rodney D. Ellis and Lucasse, Ellis, Inc., all officers,
> owners, employees, principals, and agents of either of
> them, including, but not limited to, H. Scott Dalley, and all

persons or entities acting in concert with any of them who receive actual notice of this Order by personal service or otherwise, are hereby ordered immediately upon service of this order to provide for prompt copying of, at Plaintiffs' expense, (i) any and all "notes" data, files or records of present or former customers of any Lincoln affiliate, and (ii) any and all "Alice Reports," "A-Roll" lists, and any other documents relating to any contemplated or processed change-in-employment status for any employees of the Henry Ford Health System with an account at any Lincoln affiliate.[1]

On April 19, 2004, Lincoln's agents served plaintiff with the TRO in his Kentwood apartment, and with the assistance of personnel employed by defendant Guidance Software, Inc. (Guidance Software), copied all the data from all of plaintiff's computers. The events surrounding defendants' entry into plaintiff's apartment and the copying of his computer data form the basis of the instant lawsuit.

B. THE STATE COURT COMPLAINT

Plaintiff commenced this action on April 18, 2007, by filing in the Kent Circuit Court a complaint against Dykema, Ferroli, Lincoln, and Guidance Software.[2] Plaintiff subsequently filed a substantially similar first

---

[1] Despite that this case involves a summary disposition motion brought under MCR 2.116(C)(8), we consider the TRO because defendants rely, in part, on the language of the TRO, which is a matter of public record, see MCR 2.113(F)(1)(a), and plaintiff's complaint references the TRO.

[2] On June 13, 2007, defendants removed this action to federal court, averring that "the allegations of Plaintiff's Complaint raise substantial disputed issues concerning the scope and interpretation of a Temporary Restraining Order entered by the United States District Court for the Western District of Michigan . . . ." However, a federal judge later granted plaintiff's motion to remand, finding that "the TRO is not a complex document and did not specifically retain jurisdiction in a federal court for the purpose of interpreting and enforcing it."

amended complaint, which describes in detail the circumstances surrounding defendants' conduct in serving the TRO and copying plaintiff's computer data. Because the allegations within the amended complaint supply the facts necessary to our resolution of this case, we turn to an examination of that pleading.

The amended complaint avers that in April 2004, plaintiff worked out of his apartment as an independent computer consultant for several small businesses, including Lucasse. The computers in his apartment provided the means to generate his livelihood and held confidential information concerning all his clients, such as their user identifications and passwords. Plaintiff, who suffers from AIDS, also stored on his computers highly personal information, medical records, photographs, and tax returns.

On April 19, 2004, plaintiff's doorbell rang and someone requested that plaintiff permit entry into his apartment building. Because plaintiff was not expecting visitors, he did not respond. At approximately 11:00 a.m., loud pounding on his door "jolted" plaintiff awake and he "realized that the men outside had managed to slip through the security system downstairs." Plaintiff saw papers slid under his door, and he read them after the men had departed. The papers included the TRO, which "completely blindsided" plaintiff. Soon thereafter, plaintiff's telephone rang, but he did not answer it. The caller, Ferroli, left a message declaring that a federal court subpoena allowed him and others to enter plaintiff's apartment "to either take his computers and hard drives or copy what was on them." Plaintiff "reasonably believed that he could not let Ferroli simply walk out the door with the computers," and that "he had no choice and would go to jail" if he refused Ferroli access to his computers. Plaintiff thus "returned Ferro-

li's call and agreed to" allow Ferroli "to copy the information on his computers."

Ferroli and several Guidance Software employees arrived, and plaintiff "led the group to the master bedroom where he kept two computers and four hard drives and, having seen from the subpoena that the case had something to do with Lincoln and Ellis, pointed them to the one and only hard drive that would contain Lincoln data." But "[t]he intruders . . . demanded everything." The Guidance Software personnel connected laptop computers to plaintiff's machines and transferred "every bit of information on all [plaintiff's] computers and hard drives." Only a "small percentage" of the information copied by the Guidance Software personnel related to Ellis, Lucasse, or Lincoln. The data transfer and copying process consumed 11 hours, during which period Ferroli "wandered in and out." In frail health and underweight, plaintiff "did not sleep for several days thereafter."

Four days after Ferroli and the Guidance Software technicians entered plaintiff's home, a Dykema attorney took plaintiff's deposition, urging him "to state on the record that he was suffering from AIDS[.]" As a result of illness, plaintiff had to complete the deposition later, by telephone from his bed. On July 1, 2004, Lincoln's attorneys informed the federal judge in the Ellis case that plaintiff had violated the TRO. Despite this claim and similar allegations in Lincoln's federal court complaint, defendants never uncovered or presented any evidence of wrongdoing by plaintiff or Ellis. Defendants' actions "traumatized [plaintiff], devastated his best customer, and thereby destroyed [plaintiff's] business." According to the amended complaint, Lincoln bore vicarious liability for the conduct of Dykema, Ferroli, and Guidance Software, because these

defendants "were Lincoln's agents and were acting within the scope of their agency."

The amended complaint sets forth five intentional tort claims: invasion of privacy in the form of intrusion on seclusion or into private affairs; trespass; intentional or reckless infliction of emotional distress; abuse of process; and tortious interference with business relationships or expectancies. All defendants sought summary disposition of plaintiff's claims pursuant to MCR 2.116(C)(8). Dykema, Ferroli and Guidance Software filed a separate motion seeking summary disposition under MCR 2.116(C)(10). In a written opinion and order entered on September 9, 2008, the circuit court granted defendants' motions under (C)(8) and dismissed the entirety of plaintiff's complaint.

## II. SUMMARY DISPOSITION ANALYSIS

### A. STANDARD OF REVIEW

Plaintiff challenges the circuit court's grant of summary disposition in favor of defendants regarding all five counts of his complaint. This Court reviews de novo a circuit court's summary disposition ruling. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). A court may grant summary disposition under MCR 2.116(C)(8) if "[t]he opposing party has failed to state a claim on which relief can be granted." A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings. *Corley v Detroit Bd of Ed*, 470 Mich 274, 277; 681 NW2d 342 (2004).[3] When deciding a motion under (C)(8), this Court accepts all well-pleaded factual allegations as

---

[3] In contrast, a motion brought "under MCR 2.116(C)(10) tests the *factual* sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999) (emphasis added).

true and construes them in the light most favorable to the nonmoving party. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). A party may not support a motion under subrule (C)(8) with documentary evidence such as affidavits, depositions, or admissions. *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994). Summary disposition on the basis of subrule (C)(8) should be granted only when the claim "is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery." *Kuhn v Secretary of State*, 228 Mich App 319, 324; 579 NW2d 101 (1998).

Because the circuit court granted defendants summary disposition solely under subrule (C)(8), we examine the pleaded allegations pertaining to each of the asserted intentional torts. Well-established principles guide our review. A complaint must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend . . . ." MCR 2.111(B)(1). "[T]he primary function of a pleading in Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position." *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 317; 503 NW2d 758 (1993), citing 1 Martin, Dean & Webster, Michigan Court Rules Practice, p 186. Our Supreme Court has characterized MCR 2.111(B)(1) as consistent with a "notice pleading environment . . . ." *Roberts v Mecosta Co Gen Hosp (After Remand)*, 470 Mich 679, 700 n 17; 684 NW2d 711 (2004). If a party fails to plead facts with sufficient detail, the court should permit "the filing of an amended complaint setting forth plaintiff's claims in

more specific detail." *Rose v Wertheimer*, 11 Mich App
401, 407; 161 NW2d 406 (1968); see also MCR
2.116(I)(5).

### B. INVASION OF PRIVACY

"Michigan has long recognized the common-law tort
of invasion of privacy." *Lewis v LeGrow*, 258 Mich App
175, 193; 670 NW2d 675 (2003). Dean William Prosser
has identified a Michigan case, *De May v Roberts*, 46
Mich 160; 9 NW 146 (1881), as among the first reported
decisions allowing relief premised on an invasion of
privacy theory. Prosser, *Privacy*, 48 Cal L R 383, 389
(1960). Today, the invasion of privacy tort

> has evolved into four distinct tort theories: (1) the intru-
> sion upon another's seclusion or solitude, or into another's
> private affairs; (2) a public disclosure of private facts about
> the individual; (3) publicity that places someone in a false
> light in the public eye; and (4) the appropriation of anoth-
> er's likeness for the defendant's advantage." [*Lewis*, 258
> Mich App at 193.]

Count I of plaintiff's amended complaint invokes intru-
sion on seclusion, the first of these theories.

> There are three necessary elements to establish a prima
> facie case of intrusion upon seclusion: (1) the existence of a
> secret and private subject matter; (2) a right possessed by
> the plaintiff to keep that subject matter private; and (3) the
> obtaining of information about that subject matter through
> some method objectionable to a reasonable man. [*Doe v
> Mills*, 212 Mich App 73, 88; 536 NW2d 824 (1995).]

The circuit court granted summary disposition in
favor of defendants of plaintiff's intrusion on seclusion
claim on the basis that the complaint failed to set forth
facts "that show that he had a right to privacy in those
areas of the apartment necessary to carry out the
mandate of the TRO." Relying on this Court's opinion

in *Saldana v Kelsey-Hayes Co*, 178 Mich App 230; 443 NW2d 382 (1989), the circuit court added that the TRO deprived plaintiff of a right to privacy in his computers and hard drives:

> With respect to the plaintiff's personal information on the computers, the complaint further alleges that plaintiff pointed the Dykema defendants to the "one and only hard drive that would contain Lincoln data" but that the employees of defendant Guidance copied all of the information contained on all of plaintiff's computers and hard drives. Pursuant to the TRO, the Dykema defendants had a right to copy hard drives that were potential sources of Lincoln information. Thus, even when viewed in plaintiff's favor, the complaint does not allege facts that show he had a right to privacy in his hard drives for purposes of carrying out the TRO. [Citation omitted.]

Plaintiff asserts that the circuit court misconstrued both *Saldana* and the TRO, insisting that the TRO neither invested defendants with a right to violate plaintiff's privacy nor deprived plaintiff of his common-law privacy rights.

The plaintiff in *Saldana*, a supervisor in one of the defendant's facilities, fell from a bicycle in the course of his employment. *Id.* at 232. The defendant suspected the plaintiff of malingering and hired a private investigation firm to "investigate plaintiff and to attempt to determine the extent of plaintiff's injuries." *Id.* The investigators employed a variety of surveillance techniques, including observing the plaintiff through an open window with a 1,200-millimeter camera lens and posing as a process server "for the purpose of looking around plaintiff's home[.]" *Id.* at 233. The plaintiff brought an invasion of privacy action asserting an intrusion on his seclusion. *Id.*

This Court first determined that the plaintiff "can show an intrusion," because "agents of defendants

entered plaintiff's home under false pretenses" and "the use of a powerful lens to observe the interior of a home or of a subterfuge to enter a home could be found objectionable to a reasonable person." *Id*. at 234. However, because the defendants' surveillance of the plaintiff "involved matters which defendants had a legitimate right to investigate," this Court concluded that the plaintiff failed to allege facts that showed the intrusions "were into matters which plaintiff had a right to keep private." *Id*. This Court explained that the "duty to refrain from intrusion into another's private affairs is not absolute in nature, but rather is limited by those rights which arise from social conditions, *including the business relationship of the parties*." *Id*. (emphasis in original). The Court concluded that the plaintiff's privacy interest in his home "was subject to the legitimate interest of his employer in investigating suspicions that plaintiff's work-related disability was a pretext." *Id*. at 235.

We find *Saldana* readily distinguishable from this case. In *Saldana*, the nature of the parties' relationship limited the plaintiff's right to privacy concerning the matter the defendant investigated: whether the plaintiff suffered from work-related disabilities. Here, defendants and plaintiff shared no special relationship, business or otherwise, and defendants possessed no legitimate interest in viewing plaintiff's apartment or copying computer data unrelated to Lincoln. Furthermore, we reject the circuit court's conclusion that the TRO divested plaintiff of his right to privacy in his apartment and computer hard drives. The TRO afforded defendants no right whatsoever to enter or search plaintiff's apartment.[4] Regarding plaintiff's com-

---

[4] The common law reflects "reverence . . . for the individual's right of privacy in his house." *Miller v United States*, 357 US 301, 313; 78 S Ct

puters, the TRO entitled Lincoln's agent to copy hard drives and other electronic media "which contain any Lincoln Customer Records . . . ." But no provision in the TRO authorized defendants to copy personal computer data unrelated to Lincoln.[5] Moreover, we find no support for the circuit court's determination that defendants "had a right to copy hard drives that were *potential* sources of Lincoln information." (Emphasis added.) The TRO neither mentions "potential" sources of information nor in any manner expands the reach of defendants' copying authority beyond matters directly related to Lincoln.

Plaintiff's amended complaint avers that he "had a right to privacy in his own home and a right to keep private the private information on his computers and hard drives," and that defendants invaded plaintiff's

---

1190; 2 L Ed 2d 1332 (1958). Nothing in the language of the TRO supports a construction of that document as the equivalent of a warrant permitting entry into plaintiff's apartment or authorizing a search and seizure therein.

[5] Defendants offer a patently unreasonable suggested interpretation of ¶ 9 of the TRO, the meaning of which "involves questions of law that we review de novo on appeal." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 460; 750 NW2d 615 (2008). Defendants dispute the portion of ¶ 9 instructing that plaintiff and others must

> make available . . . all hard drives and other magnetic, optical or electronic media in the possession, custody, or control of any of them, including those hard drives and other magnetic, optical, or electronic media that they have the effective power to obtain, *which contain any Lincoln Customer Records*, for prompt non-destructive copying . . . ." [Emphasis added.]

Our reading of this provision clearly and unambiguously conveys that the italicized qualifying language, "which contain any Lincoln Customer Records," refers and applies to the previously referenced electronic media whether in the possession of the specifically identified individuals like plaintiff or within their "effective power to obtain . . . ." Stated differently, in this case defendants plainly had entitlement to access only those Lincoln customer records in plaintiff's actual or constructive possession.

privacy "by intruding upon his seclusion or solitude and into his private affairs, and obtained access to [plaintiff's] home and information about his private affairs by methods objectionable to a reasonable person." This averment adequately sets forth a claim of invasion of privacy by intrusion on seclusion. The plain language of the TRO in no way renders unenforceable plaintiff's intrusion on seclusion claim.

Defendants alternatively maintain that plaintiff expressly or impliedly consented to the intrusion on his seclusion by allowing Ferroli and the Guidance Software personnel into his apartment and permitting them to copy his computer data. We resolve this contention by referring to our Supreme Court's landmark decision in *De May* and this Court's analysis in *Lewis*. The defendant in *De May*, a physician, set out on "a dark and stormy" night to attend to the plaintiff, a patient in labor. *De May*, 46 Mich at 162. Because Dr. De May "was sick and very much fatigued from overwork," he asked a defendant, Alfred Scattergood, "a young unmarried man, a stranger to the plaintiff and utterly ignorant of the practice of medicine," to accompany and assist him. *Id.* at 161-162. When they arrived at the plaintiff's home, Dr. De May told the plaintiff's husband, " 'I had fetched a friend along to help carry my things' . . . ." *Id.* at 162. Neither the plaintiff nor her husband objected to Scattergood's presence, and during most of the plaintiff's labor Scattergood sat facing a wall. *Id.* at 162, 165. At one point, Dr. De May asked Scattergood to assist by holding the plaintiff's hand "during a paroxysm of pain . . . ." *Id.* at 162. The plaintiff brought suit when she ascertained Scattergood's true identity and lack of medical training, contending that Dr. De May deceived her into believing that Scattergood "was an assistant physician . . . ." *Id.* at 161.

The Supreme Court held that the "plaintiff had a legal right to the privacy of her apartment at such a time, and the law secures to her this right by requiring others to observe it, and to abstain from its violation." *Id.* at 165-166. Notwithstanding that Scattergood and Dr. De May "were bidden to enter, treated kindly and no objection whatever [was] made to the presence of defendant Scattergood," *id.* at 162, the Supreme Court declined to hold that the plaintiff had consented to Scattergood's intrusion on her privacy:

> The fact that at the time, she consented to the presence of Scattergood supposing him to be a physician, does not preclude her from maintaining an action and recovering substantial damages upon afterwards ascertaining his true character. In obtaining admission at such a time and under such circumstances without fully disclosing his true character, both parties were guilty of deceit, and the wrong thus done entitles the injured party to recover the damages afterwards sustained, from shame and mortification upon discovering the true character of the defendants. [*Id.* at 166.]

This Court revisited *De May* in *Lewis*, a case that "involve[d] the surreptitious, nonconsensual videotaping of intimate acts of sexual relations in defendant['s] . . . bedroom." *Lewis*, 258 Mich App at 178. A jury found that the defendant had violated the plaintiffs' common-law rights to privacy. The defendant argued on appeal that because the plaintiffs had consented to having sex with him, as a matter of law he had not invaded their privacy. *Id.* at 191. This Court acknowledged that "there can be no invasion of privacy under the theory of intrusion upon the seclusion of plaintiffs if plaintiffs consented to defendant's intrusion (videotaping)." *Id.* at 194. However, "[t]he question of waiver or consent . . . does not have a zero-sum answer but, rather, presents an issue of the degree or

extent of waiver or consent granted, which depends on the facts and circumstances of the case." *Id.* Because the evidence in *Lewis* could support the plaintiffs' contention that the defendant had videotaped the plaintiffs without their knowledge or consent, this Court concluded that a factual question had existed on which reasonable minds could differ with respect to the scope of the plaintiffs' consent to the taping.

The Court in *Lewis* characterized *De May* as illustrating that "[t]he deceitful presence of a medically unqualified, unnecessary person" exceeded the plaintiff's consent to the presence of "any necessary physician's assistants." *Id.* The Court in *Lewis* further referenced the following statement from this Court's opinion in *Earp v Detroit*, 16 Mich App 271, 278 n 5; 167 NW2d 841 (1969):

> The right of privacy may be waived by the individual or by anyone authorized by him, and this waiver may be either express or implied. . . . The existence of a waiver carries with it the right to an invasion of privacy only to such an extent, however, as may be legitimately necessary and proper in dealing with the matter which has brought about the waiver, or, as otherwise stated, only to the extent warranted by the circumstances which brought about the waiver. [Quotation marks and citation omitted.]

And in *Saldana*, 178 Mich App at 234, this Court found that the plaintiff established an intrusion based on the defendants' agents' entry into the plaintiff's home "under false pretenses."

Here, plaintiff's amended complaint alleges that defendants obtained consent to enter the apartment through a combination of subterfuge and threat: "Ferroli said he had a federal court subpoena that allowed him and the other men to come inside [plaintiff's] apartment to either take his computers and hard drives

or copy what was on them." The amended complaint also avers that plaintiff withheld consent to defendants' copying of anything other than "the one and only hard drive that would contain Lincoln data." These averments fall squarely within the legal analyses and holdings presented in *De May* and *Lewis*. As described in the amended complaint, the circumstances surrounding defendants' entry into plaintiff's apartment and the copying of his computer hard drives reasonably suggest that defendants' artifice and dishonesty enticed plaintiff's consent. "Generally, the scope of a waiver or consent will present a question of fact for the jury[.]" *Lewis*, 258 Mich App at 195. As in *Lewis*, *id.*, when viewed in the light most favorable to plaintiff, the amended complaint presents factual questions on which reasonable minds could differ with respect to whether defendants gained admission to plaintiff's premises by deceit, as in *De May*, or exceeded the scope of the consent plaintiff extended, as in *Lewis* and *Earp*.

Defendants lastly argue regarding the invasion of privacy count that plaintiff's complaint contains no facts supporting plaintiff's allegation that defendants obtained private information through a method that might be objectionable to a reasonable person, or that defendants ever viewed the information they copied. Whether a reasonable person would find an intrusion objectionable constitutes a factual question best determined by a jury. *Saldana*, 178 Mich App at 234. In *Saldana*, this Court specifically opined that use "of a subterfuge to enter a home could be found objectionable to a reasonable person." *Id*. We conclude that as alleged, defendants' entry of plaintiff's apartment under false pretenses and their disregard of his instructions about the location of the Lincoln-related information they desired could be found objectionable by a reasonable juror. Furthermore, "An action for intrusion upon se-

clusion focuses on the *manner* in which the information was obtained, not on the information's publication." *Lewis*, 258 Mich App at 193 (emphasis added). In *Harkey v Abate*, 131 Mich App 177, 182; 346 NW2d 74 (1983), this Court adopted the Restatement's view that

> [t]he type of invasion of privacy asserted by plaintiff does not depend upon any publicity given to the person whose interest is invaded, but consists solely of an intentional interference with his or her interest in solitude or seclusion of a kind that would be highly offensive to a reasonable person. [*Id.*, citing 3 Restatement Torts, 2d, § 652B, p 378.]

Therefore, irrespective of whether defendants ever viewed the copied information, the amended complaint's description of the methods defendants employed to obtain the data adequately pleaded an invasion of plaintiff's seclusion.

In summary, because plaintiff's amended complaint adequately sets forth a claim for invasion of privacy by intrusion on seclusion, we conclude that the circuit court improperly granted defendants summary disposition of this claim under MCR 2.116(C)(8).

### C. TRESPASS

Plaintiff next challenges the circuit court's ruling that his amended complaint "failed to state the element of unauthorized entry that is necessary for a claim of trespass." The circuit court reasoned that defendants "had a nonconsensual privilege to enter plaintiff's apartment for the purpose of" executing the TRO. In support of this conclusion, the circuit court cited this Court's decision in *Antkiewicz v Motorists Mut Ins Co*, 91 Mich App 389; 283 NW2d 749 (1979), vacated in part on other grounds 407 Mich 936 (1979), and 2 Restatement Torts, 2d, § 210. Defendants suggest that because plaintiff refused to allow his computers to be taken

from his apartment, the circuit court correctly determined that the TRO authorized entry of the apartment for duplication of the hard drives.

A trespass is an unauthorized invasion on the private property of another. *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 705; 609 NW2d 607 (2000). In *Antkiewicz*, 91 Mich App at 396, the Court explained that "[n]ormally, a public officer who is on the premises of another pursuant to legal authorization is not liable for trespass." The circuit court in this case recognized that defendants do not qualify as public officers, but opined that they possessed analogous powers under 2 Restatement Torts, 2d, § 210, which provides as follows:

> The privilege to execute an order of a court directing the actor to put a third person in possession of land of which another is in possession, or to do any other act on the land, carries with it the privilege to enter the land for the purpose of executing the order, provided that any writ issued for the execution of the order is valid or fair on its face.

Irrespective that Michigan has not adopted this section of the Restatement, we decline to apply § 210 here because it bears no relevance to the facts of this case. The TRO neither authorized defendants to take possession of plaintiff's land nor invested them with the authority "to do any other act on the land . . . ." The TRO required plaintiff "to provide for prompt copying" of his computer data concerning Lincoln and permitted Lincoln's agents to copy the data, but it afforded defendants no right to enter plaintiff's apartment, either to obtain the computer hard drives or to accomplish the copying. Consequently, we reject as unfounded the circuit court's conclusion that the language of the TRO contemplated or authorized an entry into plaintiff's apartment.

Whether plaintiff consented to defendants' entry into his apartment presents a more difficult question. Plaintiff's amended complaint avers that he allowed defendants to enter his apartment on the basis of their misrepresentation that the TRO permitted them "to either take his computers and hard drives or copy what was on them." Michigan has not squarely considered whether in an action for trespass a misrepresentation utilized to secure a homeowner's consent to enter a private home vitiates the homeowner's consent. In *American Transmission*, this Court considered a somewhat similar issue. The *American Transmission* plaintiffs sued a television station that had recorded the interactions between a decoy customer and the plaintiffs' transmission repair personnel. The plaintiffs' complaint asserted that the defendants had committed a trespass when they "gained entry by concealing their true identity and misrepresenting their agent's relationship to them . . . ." *American Transmission*, 239 Mich App at 699-700. This Court upheld the order granting summary disposition of the plaintiffs' trespass claim in favor of the defendants, finding that although the decoy customer "misrepresented her purpose, plaintiffs' consent was still valid because she did not invade any of the specific interests relating to the peaceable possession of land that the tort of trespass seeks to protect." *Id.* at 708. The Court emphasized that the decoy customer had entered only public areas of the plaintiffs' transmission shop and videotaped a "professional discussion . . . ." *Id.* at 709. The decoy customer "did not disrupt the shop or invade anyone's private space, and the videotape she made did not reveal the intimate details of anybody's life." *Id.*

In *American Transmission*, 239 Mich App at 708, this Court cited favorably a case decided by the United States Court of Appeals for the Seventh Circuit,

*Desnick v American Broadcasting Cos, Inc*, 44 F3d 1345 (CA 7, 1995). In *Desnick*, the Seventh Circuit, in an opinion authored by Chief Judge Richard Posner, rejected the contention that journalists posing as test patients at an eye surgery center had committed a trespass, reasoning that the test patients' entry did not invade

> any of the specific interests that the tort of trespass seeks to protect. The test patients entered offices that were open to anyone expressing a desire for ophthalmic services and videotaped physicians engaged in professional, not personal, communications with strangers (the testers themselves). The activities of the offices were not disrupted . . . . Nor was there any inva[sion of] a person's private space, . . . as in the famous case of *De May v. Roberts*, 46 Mich 160, 9 N.W. 146 (1881) (where a doctor, called to the plaintiff's home to deliver her baby, brought along with him a friend who was curious to see a birth but was not a medical doctor, and represented the friend to be his medical assistant) . . . . [*Id.* at 1352 (quotation marks omitted).]

As the Seventh Circuit recognized in *Desnick*, important distinctions differentiate misrepresentations directed to gain entry to business concerns and those employed to enter a private home. The Seventh Circuit acknowledged that in a true trespass case, "there can be no implied consent in any nonfictitious sense of the term when express consent is procured by a misrepresentation or a misleading omission." *Id.* at 1351. The court posited the following illustrative example: "If a homeowner opens his door to a purported meter reader who is in fact nothing of the sort—just a busybody curious about the interior of the home—the homeowner's consent to his entry is not a defense to a suit for trespass." *Id.* at 1352. Nevertheless, the law sometimes deems effective in the trespass context a consent procured by misrepresentation. The Seventh Circuit in

*Desnick* explained the difference between the two classes of cases by contrasting the phony meter reader intruding into a home with a phony customer, reminiscent of the defendants in *American Transmission*:

> T]he homeowner victimized by the phony meter reader does not want strangers in his house unless they have authorized service functions. The dealer's objection to the customer who claims falsely to have a lower price from a competing dealer is not to the physical presence of the customer, but to the fraud that he is trying to perpetuate. [*Id.*]

A decision of the United States Court of Appeals for the Ninth Circuit, *Theofel v Farey-Jones*, 359 F3d 1066 (CA 9, 2004), further illustrates that the character of a particular deceit remains critical to a determination of the implicated privacy interests. In *Theofel*, the plaintiffs cooperated with a faulty subpoena issued by the defendants, federal court litigants, and the Ninth Circuit considered whether the plaintiffs' cooperation operated as a consent to disclosure of otherwise protected information. The Ninth Circuit analogized to the common law of trespass and, citing *Desnick*, concluded that the plaintiffs had alleged facts that vitiated their apparent consent:

> A defendant is not liable for trespass if the plaintiff authorized his entry. *See Prosser & Keeton* § 13, at 70. But "an overt manifestation of assent or willingness would not be effective . . . if the defendant knew, or probably if he ought to have known in the exercise of reasonable care, that the plaintiff was mistaken as to the nature and quality of the invasion intended." *Id.* § 18, at 119 . . . .

> Not all deceit vitiates consent. "[T]he mistake must extend to the essential character of the act itself, which is to say that which makes it harmful or offensive, rather than to some collateral matter which merely operates as an inducement." *Prosser & Keeton* § 18, at 120 . . . . In other

words, it must be a "substantial mistake[] . . . concerning the nature of the invasion or the extent of the harm." *Restatement (Second) of Torts* § 892B(2) cmt. g. . . .

[T]he theory is that some invited mistakes go to the essential nature of the invasion while others are merely collateral. Classification depends on the extent to which the intrusion trenches on "the specific interests that the tort of trespass seeks to protect." *Desnick*, 44 F.3d at 1352 . . . .

\*   \*   \*

Under this standard, plaintiffs have alleged facts that vitiate [their internet service provider] NetGate's consent. NetGate disclosed the sample in response to defendants' purported subpoena. Unbeknownst to NetGate, that subpoena was invalid. This mistake went to the essential nature of the invasion of privacy. The subpoena's falsity transformed the access from a bona fide state-sanctioned inspection into private snooping. The false subpoena caused disclosure of documents that otherwise would have remained private; it effected an "invasion . . . of the specific interests that the [statute] seeks to protect." *Desnick*, 44 F.3d at 1352. [*Theofel*, 359 F3d at 1073-1074 (some citations omitted).]

The Ninth Circuit concluded that "[b]ecause defendants procured consent by exploiting a mistake of which they had constructive knowledge, the district court erred by dismissing based on that consent." *Id.* at 1075.[6]

---

[6] Although *Theofel* involved an invalid subpoena rather than a valid TRO, we find instructive its discussion regarding the duties attendant on those who invoke the powers of the court:

The subpoena power is a substantial delegation of authority to private parties, and those who invoke it have a grave responsibility to ensure it is not abused. Informing the person served of his right to object is a good start, *see* Fed.R.Civ.P. 45(a)(1)(D), but it is no substitute for the exercise of independent judgment about the subpoena's reasonableness. Fighting a subpoena in court is not

"[T]respass is an invasion of the plaintiff's interest in the exclusive possession of his land . . . ." *Adams v Cleveland-Cliffs Iron Co*, 237 Mich App 51, 59; 602 NW2d 215 (1999) (quotation marks and citation omitted). Under the common law, a trespass on land violated the landowner's right to exclude others from the premises. *Id.* at 60. Here, plaintiff's amended complaint avers that defendants obtained his consent to enter the apartment by representing that a "federal court subpoena" authorized their access to the inside of plaintiff's apartment, that defendants' entry constituted a trespass, and that "[t]hey intended to intrude on [plaintiff's] private property without authorization to do so." We conclude that these averments adequately delineate a trespass claim and that defendants' alleged misrepresentations could reasonably be found to have vitiated plaintiff's consent to the entry of his apartment. Because the interest protected by the common-law tort of trespass is identical to that identified in plaintiff's amended complaint, this case more closely parallels the phony meter reader's entry into a residence than the decoy customers' entries into business premises. Accordingly, we reverse the circuit court's grant of summary disposition in defendants' favor of the trespass claim.

### D. INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

Plaintiff further asserts that the circuit court erred by granting in defendants' favor summary disposition of his claim for intentional or reckless infliction of emotional distress. According to plaintiff, reasonable minds could differ with respect to whether defendants' conduct qualified as outrageous in light of Ferroli's status as a lawyer,

---

cheap, and many may be cowed into compliance with even overbroad subpoenas, especially if they are not represented by counsel or have no personal interest at stake. [*Id.* at 1074-1075.]

plaintiff's AIDS-related disability, and the prolonged time defendants spent in plaintiff's bedroom. "To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh*, 263 Mich App at 634. "[O]nly when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community' " will liability attach. *Id.*, quoting *Graham v Ford*, 237 Mich App 670, 674; 604 NW2d 713 (1999). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to liability for intentional infliction of emotional distress. *Doe*, 212 Mich App at 91. Initially, the trial court must determine whether a defendant's conduct qualifies as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress. *Sawabini v Desenberg*, 143 Mich App 373, 383; 372 NW2d 559 (1985).

Even accepting as true the allegations in plaintiff's amended complaint, they fail to describe conduct so extreme or outrageous that it surpasses all bounds of decency in a civilized society. Assuming that Ferroli misled plaintiff about the scope of the TRO, defendants' conduct inside plaintiff's apartment simply does not amount to atrocious or extreme behavior. At worst, defendants' engaged in actions that were annoying and oppressive, but these actions do not rise to the level of outrageousness necessary to establish a claim for intentional infliction of emotional distress. We thus conclude that the circuit court correctly dismissed this claim under MCR 2.116(C)(8).

E. ABUSE OF PROCESS

Plaintiff additionally contends that the circuit court improperly granted summary disposition in defendants' favor of his abuse of process count.

> A meritorious claim of abuse of process contemplates a situation where the defendant has availed himself of a proper legal procedure for a purpose collateral to the intended use of that procedure, e.g., where the defendant utilizes discovery in a manner consistent with the rules of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms. [*Vallance v Brewbaker*, 161 Mich App 642, 646; 411 NW2d 808 (1987).]

In a case alleging abuse of process, the pleadings must allege with specificity an act committed in the use of process "that is improper in the regular prosecution of the proceeding." *Early Detection Ctr, PC v New York Life Ins Co*, 157 Mich App 618, 629; 403 NW2d 830 (1986). A complaint must allege more than the mere issuance of the process, because an "action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Friedman v Dozorc*, 412 Mich 1, 31; 312 NW2d 585 (1981) (quotation marks and citation omitted). A claim asserting nothing more than an improper motive in properly obtaining process does not successfully plead an abuse of process. *Young v Motor City Apartments Ltd Dividend Housing Ass'n No 1 & No 2*, 133 Mich App 671, 681; 350 NW2d 790 (1984).

Plaintiff's amended complaint alleges that defendants harbored an "ulterior purpose" to "serve Lincoln's strategy of intimidating and harassing Ellis, and give Lincoln a tactical business advantage over Ellis when there was no factual basis for the proceeding."

Even assuming that plaintiff may properly assert a collateral purpose directed solely at harming a third party, the amended complaint fails to allege with specificity any acts committed in furtherance of this purpose. Moreover, "the ulterior purpose alleged must be more than harassment, defamation, exposure to excessive litigation costs, or even coercion to discontinue business." *Early Detection Ctr*, 157 Mich App at 629-630. We agree with the circuit court's finding that plaintiff simply did not identify an act or facts supporting the allegation that defendants used the TRO for an improper, collateral purpose. However, pursuant to MCR 2.116(I)(5), the circuit court must afford plaintiff an opportunity to amend his complaint to set forth his abuse of process claim in greater detail.

### F. TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR EXPECTANCY

Plaintiff lastly disputes the circuit court's grant of summary disposition in defendants' favor concerning his claim for tortious interference with a business relationship or expectancy.

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. [*BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996).]

To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification. *Bonelli v Volkswagen of America, Inc*, 166

Mich App 483, 498; 421 NW2d 213 (1988). To establish that a defendant's conduct lacked justification and showed malice, "the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Laboratories*, 217 Mich App 699. "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.*

Plaintiff's amended complaint asserts that defendants knew or should have known that their pursuit of the TRO and a vindictive, groundless lawsuit against Ellis would disrupt plaintiff's business relationship with Ellis and Lucasse. These allegations do not set forth a claim for tortious interference with a business relationship. "[I]n order to succeed under a claim of tortious interference with a business relationship, the plaintiffs must allege that the interferer did something illegal, unethical or fraudulent. There is nothing illegal, unethical or fraudulent in filing a lawsuit, whether groundless or not." *Early Detection Ctr*, 157 Mich App at 631 (citation omitted). We also decline to find that defendants' pursuit of the TRO amounts to illegal, unethical, or fraudulent conduct and conclude, as did the circuit court, that plaintiff's amended complaint fails to allege any act of improper interference sufficient to allow him to maintain his tortious interference claim.

### III. ADDITIONAL ISSUES

Because the circuit court granted defendants summary disposition of all claims pleaded in the amended complaint, the court declined to address (1) Lincoln's argument that as a matter of law plaintiff cannot establish its vicarious liability; (2) Dykema and Ferroli's motion for summary disposition premised on MCR

2.116(C)(10); and (3) Dykema and Ferroli's contention that a litigation privilege entitles them to judgment as a matter of law. We similarly decline to address these additional issues raised by defendants on which the circuit court reserved ruling. *People v Herrick*, 277 Mich App 255, 259; 744 NW2d 370 (2007) (observing that generally appellate review is limited to issues decided by the trial court).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.