# STATE OF MICHIGAN

# COURT OF APPEALS

KIMBERLY RODRIGUEZ,

        Plaintiff-Appellee,

v

UNIVERSITY OF MICHIGAN BOARD OF
REGENTS and UNIVERSITY OF MICHIGAN,

        Defendants,

and

CATHY KENDRICK and BRIANNA FOSTER,

        Defendant-Appellants

UNPUBLISHED
January 25, 2018

No.  337081
Washtenaw Circuit Court
LC No.  14-000880-CL

Before:  TALBOT, C.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Defendant-Appellants, Cathy Kendrick and Brianna Foster, appeal as of right the trial court's order denying University of Michigan Board of Regents, University of Michigan, and defendant-appellants (collectively "defendants") motion for summary disposition under MCR 2.116(C)(7) with respect to plaintiff's three intentional tort claims against defendant-appellants. Because Kendrick and Foster were entitled to individual governmental immunity, we reverse and remand for entry of summary disposition in favor of Kendrick and Foster with respect to plaintiff's intentional tort claims.

This case arises from an employment discrimination suit brought by plaintiff, who is white, against defendants.  Plaintiff's employment as a nurse with defendant University of Michigan was terminated on July 28, 2014.  The discharge was based on plaintiff's alleged use of "excessive force" to restrain a patient (Patient S) on July 15, 2014.  On the night in question, plaintiff and Foster were the only two treating Patient S, and they were the only two that witnessed the events that led to plaintiff's termination.

Foster and plaintiff gave different versions of what happened that night, but the essential events are the same.  Patient S was in restraints.  At some point during the night, Foster and

-1-

plaintiff went to turn Patient S and saw that he had soiled himself. After cleaning the patient, Foster re-applied one restraint and plaintiff did the other. When they were done restraining the patient, plaintiff tightened the restraint that Foster had tied, and Foster told her that the restraint was too tight.

According to Foster, the following events occurred directly after plaintiff tightened Patient S's restraints, and plaintiff contended that the following events occurred later in the night. According to Foster, after plaintiff tightened the patient's restraint, he began screaming. When he would not stop, plaintiff placed a pillow over the patient's face. When Foster told plaintiff that it was unprofessional, plaintiff removed the pillow and began to perform oral care[1] on the patient. Before plaintiff could insert the swab into the patient's mouth, Foster took the oral care piece from plaintiff and told her that it was not the time for that. According to plaintiff, her and Foster came back later in the night and Patient S had soiled himself again. After cleaning the patient, he grabbed his catheter, which had been surgically placed, and began pulling at it. Plaintiff grabbed a pillow and threw it on Patient S's abdomen to obstruct his view, and then removed the patient's hand from his catheter. Plaintiff was not certain if the pillow touched the patient's face. Plaintiff saw that Foster was upset, and Foster asked plaintiff "What is wrong with you? Why would you do that?" but plaintiff did not respond and focused on caring for the patient. Plaintiff then noticed that the patient had a large piece of dead skin hanging from the corner of his mouth, and plaintiff was concerned that the patient would inhale the skin and choke on it because he had aspiration pneumonia. To prevent this, plaintiff took a swab and tried to swipe the skin away, but Foster hit plaintiff's arm and told her to stop. Foster then quickly walked away, visibly upset.

All parties agree that, following these events, Autumn Richards, another nurse, entered the room because she had heard Patient S screaming. According to plaintiff, she told Richards that Foster was acting "like I'm trying to hurt the patient," and that she was in shock and said, "This is just bad . . . He's going to wake everybody in the place up. You know, I've just got to get him to calm down, you know, poor guy." According to Richards, when she entered the room, plaintiff was standing with a pillow in her hands next to Patient S and said, "[Foster] acts like I was trying to kill him. I was just trying to get him to be quiet."

Richards later spoke to Foster to find out what happened. Based on what Foster told Richards and what Richards saw when she walked in, she wrote an e-mail at 3 a.m. to Kendrick, the nurse supervisor, and Terri Roth, another supervisor, explaining what she had seen and what Foster told her. Later that same morning, Foster met with Roth in person and told her what she had witnessed. Kendrick, who was plaintiff's nurse supervisor, investigated Richard's e-mail. After talking with Foster and Richards, and holding a disciplinary review conference where plaintiff, with union representation, was able to tell her side of the story, Kendrick recommended that plaintiff be discharged. Pursuant to a recommendation from HR, Kendrick contacted

---

[1] Foster explained that oral care meant "swabbing the mouth with a moistened swab, and it's used to prevent pneumonia and used for patients like [Patient S] who can't perform, you know, oral care, who can't brush their teeth."

security regarding the alleged incident with Patient S, and security subsequently contacted police.

Detective Ryan Cavanaugh investigated the incident, and he ultimately found probable cause to believe a crime had been committed. The detective explained that he reached this conclusion after interviewing Foster and Richards, who's stories corroborated one another, and then interviewing plaintiff, whose interview raised several "red flags." The prosecutor decided to follow through with pressing charges, and plaintiff was subsequently criminally charged with misdemeanor assault and battery for her treatment of Patient S. After a trial, plaintiff was acquitted.

On December 23, 2015, plaintiff filed a ten count complaint. Relevant to this appeal, plaintiff alleged that Kendrick and Foster had intentionally misrepresented and excluded exculpatory information when speaking to police about the incident involving Patient S, and that Foster had "falsely report[ed that] Plaintiff assaulted and battered a patient" for the purpose of "induc[ing] the termination of Plaintiff's employment." Plaintiff alleged that Foster, who is black, falsely reported an assault and battery based, in part, on "racial bias" towards plaintiff. Plaintiff alleged that Kendrick, who is also black, decided to discharge plaintiff based substantially on plaintiff's race. Plaintiff alleged that both Foster and Kendrick believed that plaintiff was a racist because plaintiff had previously remarked to Foster that she looked like "Aunt Jemima" when Foster wore a colorful headdress to work, and Foster complained of the incident to Kendrick, who then spoke with plaintiff.

After depositions, defendants moved for summary disposition. Relevant to this appeal, defendants argued that Foster and Kendrick were entitled to summary disposition under MCR 2.116(C)(7) because plaintiff's tort claims against them were barred by immunity. The trial court denied the motion, finding that, based on the "underlying racial animus" between Foster and plaintiff, there was a question of fact regarding whether Foster and Kendrick acted with malice.

On appeal, defendants argue that the trial court erred by not granting Kendrick and Foster summary disposition under MCR 2.116(C)(7). We agree. "We review de novo a trial court's grant of summary disposition." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016). Defendants sought summary disposition pursuant to MCR 2.116(C)(7). As explained by the Michigan Supreme Court in *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008):

> Under MCR 2.116(C)(7), the moving party is entitled to summary disposition if the plaintiff's claims are barred because of immunity granted by law . . . . The moving party may support its motion for summary disposition under MCR 2.116(C)(7) with affidavits, depositions, admissions, or other documentary evidence, the substance of which would be admissible at trial. The contents of the complaint are accepted as true unless contradicted by the evidence provided. [Citations and quotation marks omitted; alteration in original.]

In *Odom*, the Michigan Supreme Court provided the following "steps to follow when a defendant raises the affirmative defense of individual governmental immunity":

(1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).

(2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

(3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:

(a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

(b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

(c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* test by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial. [*Odom*, 482 Mich at 479-480.]

It is undisputed on appeal that Foster and Kendrick are lower-ranking governmental employees.[2] At issue in this appeal are only plaintiff's tort claims: malicious prosecution claims against

---

[2] MCL MCL 691.1407(5) provides:

A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

Clearly, neither Kendrick nor Foster falls into this category, so we proceed to step two in *Odom*.

Kendrick and Foster, and tortious interference with a business relationship against Foster. All of these claims are intentional torts. See *Odom*, 482 Mich at 464-465 (stating that malicious prosecution is an intentional tort); *Dalley v Dykema Gossett*, 287 Mich App 296, 304; 788 NW2d 679 (2010) (stating that tortious interference with business relationships is an intentional tort). Thus, for Foster and Kendrick to be entitled to governmental immunity, they need to establish:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that [she] was acting, within the scope of [her] authority,

> (b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial. [*Odom*, 482 Mich at 480.]

On appeal, Kendrick and Foster bear the burden of establishing that they are entitled to immunity. See *id*. at 479 ("[T]he burden continues to fall on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense.").

With respect to the first element, Foster reporting plaintiff's actions and Kendrick investigating them are clearly "acts taken during the course of . . . employment" that Kendrick and Foster "reasonably believe[d]" were "within the scope of [their] authority." *Id*. With respect to Kendrick, she investigated a report that plaintiff used excessive force against a patient. She received this report from Richards and later confirmed it with Foster. During the course of investigating the report, Kendrick was advised that she needed to report plaintiff's alleged conduct to security, which Kendrick did. It was reasonable for Kendrick to believe that investigating the allegations of misconduct against her subordinate and reporting those allegations to security due to their serious nature were within the scope of her authority as a nurse supervisor. Likewise, it would be reasonable for Foster to believe that her conduct of reporting an alleged assault made upon a patient during the course of employment was within the scope of her authority. Thus, Foster's and Kendrick's actions clearly satisfy the first element.

The main issue on appeal is whether Kendrick and Foster satisfied the second element. With regard to Kendrick, the record is clear that her investigation and report to police were "not undertaken with malice." *Odom*, 482 Mich at 480. Kendrick received reports from two separate sources—Foster and Richards—that plaintiff had engaged in misconduct, namely using unnecessary or excessive force with a patient. Based on these reports, Kendrick appropriately investigated the incident. As part of her investigation, Kendrick requested direction from HR, who told her to contact security. Security then contacted the police, and Kendrick repeated to the police what she had been told. From there, the police investigated the incident, and ultimately decided that it was appropriate to bring charges against plaintiff. During Kendrick's investigation, she interviewed multiple people, including plaintiff, in an apparent attempt to ascertain exactly what occurred with Patient S. Kendrick coordinated with HR to conduct a disciplinary review conference, where plaintiff was able to present her side of what happened. Kendrick ultimately found plaintiff's explanation inadequate based largely on Richard's e-mail. Kendrick explained that Richards's recollection of the events that occurred when she first

entered the room tended to contradict what plaintiff said occurred. On this record, it appears that Kendrick investigated, in good faith, the report that plaintiff had engaged in misconduct, and, in good faith, contacted security and subsequently relayed what she was told to the police.

Plaintiff contends that Kendrick acted with malice because she "told the investigating officer Plaintiff had used 'aggressive and undue force' although she was not a witness to any of the relevant events." However, contrary to plaintiff's assertion, Kendrick reported to the investigating officer that she received reports to that effect. Plaintiff also points to the fact that Kendrick "failed to tell the investigating officer she had not consulted the patient's medical records, or even talked to the attending physician." However, this, at best, evidences negligence, not malice. Moreover, Detective Cavanaugh testified that he did not look into the patient's medical records. Plaintiff also contends that "there is an issue of fact Defendants considered Plaintiff a racist," which provided Kendrick with motivation to lie to the police. However, we see nothing in this record that could support plaintiff's assertion that Kendrick's potential motivation to lie influenced her investigation or her statements to the police. Kendrick's investigation was proper and reasonable. Plaintiff faced serious allegations, and Kendrick was tasked with investigating those allegations as plaintiff's supervisor. The basis for Kendrick's investigation was not just allegations levied against plaintiff by Foster; the allegations against plaintiff were reported by Richards, who believed that something suspicious was happening because plaintiff initially said that she "was holding the pillow in front of [the patient's] face" because she "didn't want him disturbing the other patients," but then later said that she was trying to protect Foster. Once Kendrick was contacted by police about the allegations, she told the police what was reported to her. On this record, there is no question that Kendrick's actions were not undertaken with malice.

With respect to Foster, she also established that her actions were not undertaken with malice. Foster testified that she witnessed plaintiff use excessive force when tightening Patient S's restraint, that she saw plaintiff place a pillow on Patient S's face when he was screaming, and that she witnessed plaintiff perform oral care on Patient S for no apparent reason while the patient was agitated. Foster testified that she reported all of these things to her supervisor Roth and later to police.

Plaintiff puts forward a different version of events and contends that there is a question of fact regarding whether Foster intentionally misrepresented the events to her supervisor and the police, and, therefore, there is a question of fact as to whether Foster acted with malice. However, despite plaintiff's assertion that Foster's recollection of the events is wrong, there is no support in the record that Foster intentionally misrepresented these events. Plaintiff testified that Foster told plaintiff that plaintiff tied Patient S's restraints too tight, which is what Foster reported to her supervisors and the police. Plaintiff also testified that, when she threw the pillow on Patient S's abdomen to block his view of his catheter, Foster was upset, and when Foster questioned plaintiff as to why she did that, plaintiff did not answer her.[3] Plaintiff admitted that

_____

[3] Plaintiff and Foster's testimony differed on this point; Foster testified that plaintiff told Foster that she did not want the patient disturbing the other patients, whereas plaintiff testified that she "really didn't want to reason with anybody any more about why [she] was doing what [she] was

-6-

she was uncertain whether the pillow touched the patient's face. Foster reported that plaintiff placed the pillow on the patient's face; this is not contradicted by plaintiff's testimony, and, if that is what Foster believed plaintiff was doing, it would explain why Foster was upset, as plaintiff testified. With respect to the oral care, plaintiff again knew that Foster was upset and apparently did not understand plaintiff's reason for choosing to perform oral care while the patient was agitated, but plaintiff again did not explain to Foster why she felt that oral care was necessary at that time. Foster reported that plaintiff proceeded to perform oral care for no reason. In essence, Foster reported what she saw to her supervisor and to the police, and plaintiff testified to essentially the same things, but explained her reasons for taking those actions. On this record, Foster, who reported essentially the same events as plaintiff, established that she did not act with malice when reporting plaintiff's actions because, contrary to plaintiff's argument, there is nothing to indicate that Foster intentionally lied or misrepresented what happened.

Plaintiff alleges that Foster had a motive to lie because Foster believed that plaintiff was a racist based on plaintiff's racist remarks. Even if Foster believed that plaintiff was racist, they reported essentially the same events, and merely differed on plaintiff's reasons for those actions. Based on Foster's perceptions of the events, Foster believed that she should report plaintiff's behavior, so she spoke with Richards, then with Roth, and eventually with the police. On this record, Foster established that she did not act with malice in reporting plaintiff's conduct because she reported the same events as plaintiff, and her perceptions of the events were such that reporting them was appropriate.

With respect to the third element, both Foster's reporting of, and Kendrick's investigating of, plaintiff's actions were discretionary, rather than ministerial, acts. As explained by *Odom*:

> A ministerial officer has a line of conduct marked out for him, and has nothing to do but to follow it; and he must be held liable for any failure to do so which results in the injury of another. Ministerial acts constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice. The execution of an act once a decision has been made is also ministerial in nature. Discretion, on the other hand, implies the right to be wrong. Discretionary acts require personal deliberation, decision and judgment. Although the decision need not be extraordinary, governmental immunity is not afforded for every trivial decision an actor may make. Granting immunity to an employee engaged in discretionary acts allows the employee to resolve problems without constant fear of legal repercussions. [*Id.* at 475-476 (citations and quotation marks omitted).]

___

doing," so she just focused on caring for the patient. On this point, Richards's testimony supports Foster's version of the events—that plaintiff did not want the patient disturbing other patients—but this is irrelevant. Even under plaintiff's version, Foster simply did not know plaintiff's reason for placing the pillow on the patient, possibly on the patient's face, and Foster was upset at what plaintiff did.

With regards to Foster, Foster's conduct of reporting plaintiff was not "a line of conduct marked out for [her]." *Id*. Foster could have chosen to not report plaintiff, and her decision to do so, or not do so, was an act requiring "personal deliberation, decision and judgment." *Id*. Even the way in which Foster reported plaintiff's alleged misconduct was an act that required personal judgment; Foster chose to personally meet with Roth to report the incident, whereas Richards, who likewise reported the incident, chose to send an e-mail to Kendrick and Roth. Therefore, Foster established the third element. With regard to Kendrick, her investigation of the incident was also a discretionary task. There were no "orders" that Kendrick had no choice but to follow, and rather she had discretion whether to move forward at each step of the investigation. Investigating misconduct is clearly a discretionary, rather than a ministerial, task, and, therefore, Kendrick satisfied the third element. See *Young v Barker*, 158 Mich App 709, 725; 405 NW2d 395 (1987) (holding that investigatory police work is discretionary rather than ministerial).

Accordingly, Foster and Kendrick established that they were entitled to individual governmental immunity because they both reasonably believed that their actions were within the scope of their employment, neither of their actions were undertaken with malice, and both of their acts were discretionary. Therefore, the trial court erred by not granting defendants' motion for summary disposition under MCR 2.116(C)(7) because plaintiff's intentional tort claims against Kendrick and Foster were barred by immunity.

Reversed and remanded for entry of summary disposition in favor of Kendrick and Foster. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien

-8-