# STATE OF MICHIGAN

# COURT OF APPEALS

ARMEN BOLADIAN, BRIDGEPORT MUSIC, INC., and WESTBOUND RECORDS, INC.,

    Plaintiffs-Appellants,

v

JEFFREY P. THENNISCH, THE DOBRUSIN LAW FIRM P.C. f/k/a DOBRUSIN & THENNISCH P.C., GREGORY J. REED and JANYCE TILMON-JONES,

    Defendants-Appellees.

UNPUBLISHED
April 12, 2016

No. 324737
Oakland Circuit Court
LC No. 2014-138753-CZ

Before: TALBOT, C.J., and WILDER and BECKERING, JJ.

PER CURIAM.

In this interlocutory appeal, plaintiffs, Armen Boladian, Bridgeport Music, Inc., and Westbound Records, Inc., appeal by delayed leave granted the trial court's order granting summary disposition to defendants Jeffrey P. Thennisch, Janyce Tilmon-Jones, and the Dobrusin Law Firm, P.C., f/k/a Dobrusin & Thennisch, P.C.,[1] on several counts of plaintiffs' complaint. This Court granted leave to consider plaintiffs' claims for abuse of process and malicious prosecution.[2] This Court also stayed the trial court proceedings pending resolution of the appeal. Because we find that the trial court neither erred in granting summary disposition nor abused its discretion in denying plaintiffs' motion for leave to amend their complaint, we affirm, lift this Court's stay, and remand to the trial court for further proceedings not inconsistent with this opinion.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Armen Boladian owns Bridgeport Music Company, a music publishing company, as well as Westbound Records, a record company. Janyce Tilmon-Jones is the widow of Abrim Tilmon,

---

[1] The proceedings were stayed as to defendant Gregory J. Reed at the time of the summary disposition ruling because of ongoing bankruptcy proceedings.

[2] *Boladian v Thennisch*, unpublished order of the Court of Appeals, issued April 30, 2015.

Jr. (Tilman), a deceased Bridgeport songwriter and musical artist. At some point during his career, Tilmon entered into agreements with Bridgeport and assigned to Bridgeport his interest in 41 different songs. Bridgeport filed copyright registrations for the songs. Defendants Gregory J. Reed and Jeffrey P. Thennisch are two Detroit-area attorneys who represented Tilmon-Jones in various copyright actions against defendants involving Tilmon's songs and compositions. The Dobrusin Law Firm is Thennisch's former law firm. Reed was never associated with the firm.

## A. PRIOR LITIGATION

The parties have been involved in several legal proceedings with each other, which lead up to and give rise to the allegations in plaintiffs' instant complaint.

### 1. PROCEEDINGS RELATED TO THE 2006 LAWSUIT AND SETTLEMENT

The first action began in September 2006 when Tilmon-Jones, individually and as personal representative of Tilmon's estate, filed suit in the United States District Court for the Eastern District of Michigan against Boladian and Bridgeport. Tilmon-Jones alleged copyright infringement related to unpaid royalties for two musical compositions from Tilmon's catalog of songs, "Feel the Need in Me" and "Yes, I Know I'm in Love." The parties settled the dispute in September 2007 by entering into a consent order and settlement agreement. The settlement contained broad language pertaining to any claim, known or unknown, that could have been addressed in the action filed by Tilmon-Jones. It does not appear that Thennisch or Reed represented Tilmon-Jones in this lawsuit.

In January 2010, Tilmon-Jones, through Reed and Thennisch, filed a motion to enforce the settlement order from the 2006 action. She later withdrew the motion after receiving a letter from plaintiffs' counsel stating that the terms of the settlement had been fulfilled. Later, in November 2010, Tilmon-Jones moved to set aside the settlement by alleging that Boladian and Bridgeport failed to disclose the existence of certain royalty statements, thereby fraudulently inducing Tilmon-Jones to settle the matter based on incomplete information. But again, she withdrew her motion after receiving correspondence from opposing counsel.

In 2011, Tilmon-Jones filed another motion to set aside the settlement agreement, alleging that Boladian and Bridgeport failed to disclose certain information during discovery in the 2006 lawsuit. The United States District Court denied the motion, finding that "the allegations do not have a basis in fact." In pertinent part, the court noted that plaintiffs had documentation to demonstrate that they gave Tilmon-Jones the disputed information before entering into the settlement agreement. The court awarded sanctions against Reed and Thennisch on September 26, 2012, based on the attempt to reopen the settlement agreement.

### 2. 2011 LAWSUIT

In 2011, at or around the same time Tilmon-Jones filed motions to set aside the settlement order discussed above, defendants, acting for Tilmon-Jones, along with Catherine M. Cartwright and Steven M. Tilmon, the heirs of the Tilmon estate, and Global Royalty Network

and Publishing,[3] filed a lawsuit ("the 2011 lawsuit") against Boladian, Bridgeport, Westbound, and other music publishing and record companies,[4] in the Eastern District of Michigan. The lawsuit asserted claims of copyright infringement, distribution of false copyright information, and fraud, and alleged that Bridgeport's former copyright administrator, Jane Peterer, wrongfully filed copyright renewals for 34 compositions by Tilmon. Based on her interpretation of federal copyright law, it was Tilmon-Jones's position that, after her husband's death, the copyright renewals reverted to her as the heir of Tilmon's estate. The suit concerned all of the songs in the Tilmon catalog, and continued to assert that the settlement of the 2006 action was produced by fraud and/or was the result of plaintiffs' failure to produce certain documents.

On September 26, 2012, the district court dismissed the suit, concluding that the complaint lacked factual and legal support. The court concluded that "[t]he broad language of the release" from the 2006 lawsuit "clearly bars [Tilmon-Jones's] claims in this matter." According to the court, it was clear from the settlement and release that the parties' "intent was to bar claims that were brought or could have been brought in the 2006 action," and that had Tilmon-Jones exercised reasonable diligence, she "could have brought claims related to all the songs at issue in the 2006 action." Once again, the court awarded sanctions to Boladian and Bridgeport. The sanctions were premised, in part, on "several inflammatory and irrelevant declarations against Bridgeport" that were asserted in an affidavit from Peterer. In the court's opinion and order awarding sanctions, it noted that Reed, before filing the affidavit, sought $1 million from Bridgeport in exchange for a promise not to file the affidavit; this, according to the court, suggested that the affidavit "was not filed for its merit, but for an improper purpose," i.e., extorting a settlement. The court later sealed the affidavit. Yet, after the Peterer affidavit was sealed, Reed filed his own affidavit and repeated some of the allegations from the Peterer affidavit. Reed was later sanctioned for his conduct.

### 3. PROCEEDINGS RELATED TO 2003 DEFAULT

Tilmon-Jones, once again represented by Reed and Thennisch, initiated additional proceedings against Bridgeport and Westbound in 2011, this time based on a 2003 default judgment that the companies had obtained in an action to which Tilmon-Jones was not a party. Tilmon-Jones claimed that one of Tilmon's songs was at issue in the action out of which the 2003 default arose, so she filed a motion to set aside the default in the Eastern District of Michigan.

The district court denied Tilmon-Jones's motion, finding she lacked standing. She also moved for reconsideration and for relief from judgment; these motions were denied. After Tilmon-Jones appealed the ruling to the Sixth Circuit Court of Appeals, the court denied the appeal and imposed sanctions on Tilmon-Jones, finding the appeal was frivolous. The court

---

[3] The nature and extent of Global Royalty Network and Publishing's involvement in the action is unclear from the record.

[4] Boladian was the president of all of the companies, except for one, Sync2Picture.

determined that Tilmon-Jones lacked standing, that her claim was untimely, and that she had released any and all claims as part of the settlement of the 2006 lawsuit.

## 4. TENNESSEE PROCEEDINGS

In addition to the actions filed in Michigan, Tilmon-Jones, acting *in propria persona*, sought to vacate seven final orders entered in lawsuits filed by Bridgeport in 2001 against various music artists. Tilmon-Jones's motions, filed in 2011—approximately ten years after the final orders were entered—alleged that one of Tilmon's songs was at issue in the 2001 lawsuits, and that she had been unable to assert her rights because she was unaware of the 2001 litigation. According to plaintiffs' complaint, although Tilmon-Jones proceeded *in propria persona*, she was assisted by Reed and Thennisch, who "ghost[-]wrote the documents she filed for her."

The United States District Court denied the seven motions based on its conclusions that Bridgeport owned the copyrights at issue, and Tilmon-Jones released any claims in the settlement of the 2006 lawsuit. Once again, the court imposed sanctions against Tilmon-Jones because she made "ill-founded allegations," and because there was no legal basis for attempting to vacate the final judgments.

## B. THE INSTANT COMPLAINT AND RELATED PROCEEDINGS

On February 6, 2014, plaintiffs filed the instant complaint against defendants, alleging defamation,[5] civil conspiracy, conversion, abuse of process, and malicious prosecution. As to abuse of process, plaintiffs alleged that defendants improperly utilized "the process of the court" by filing the Peterer and Reed affidavits noted above. As to malicious prosecution, plaintiffs argued that defendants initiated all of the proceedings outlined above "for a purpose other than to secure the proper adjudication of the claims."

The trial court granted summary disposition to defendants, finding that plaintiffs failed to state a claim. It found that plaintiffs failed to allege process that had been abused by defendants. It also concluded that plaintiffs failed to allege special injury—a necessary element for malicious prosecution—and that this failure was fatal to the claim. The trial court later denied plaintiffs' motion for leave to amend their complaint, finding that amendment would be futile.

## II. ANALYSIS

We review de novo the trial court's decision to grant summary disposition pursuant to MCR 2.116(C)(8). *AFP Specialties, Inc v Vereyken*, 303 Mich App 497, 503; 844 NW2d 470 (2014). "A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings." *Dalley v Dykema Gossett*, 287 Mich App 296, 304; 788

_____

[5] According to plaintiffs' complaint, Reed and Thennisch falsely alleged to Bill Proctor, a reporter for "Channel 7 in Detroit," that Boladian and Bridgeport failed to pay royalties to over 200 artists. This resulted in a television report and related articles posted on the Internet. The defamation action is not part of this appeal.

NW2d 679 (2010). "When deciding a motion under (C)(8), this Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the nonmoving party." *Id.* at 304-305. A plaintiff's conclusions, unsupported by allegations of fact, are not enough to support a claim. See *Lansing Schs Ed Ass'n v Lansing Bd of Ed (On Remand)*, 293 Mich App 506, 519; 810 NW2d 95 (2011). "A motion under MCR 2.116(C)(8) is appropriately granted where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* at 513 (citation and quotation marks omitted).

In addition to arguing that summary disposition was inappropriate, plaintiffs argue that the trial court should have granted leave to amend their complaint. This Court reviews the trial court's decision whether to grant leave to amend a complaint for an abuse of discretion. *PT Today, Inc v Comm'r of Fin & Ins Serv*, 270 Mich App 110, 142; 715 NW2d 398 (2006). A motion for leave to amend "should ordinarily be denied only for particularized reasons, including undue delay, bad faith or a dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility." *Id.* at 143. Here, the trial court found that amendment would be futile. "An amendment would be futile if (1) ignoring the substantive merits of the claim, it is legally insufficient on its face; (2) it merely restates allegations already made; or (3) it adds a claim over which the court lacks jurisdiction." *Id.* (citations omitted).

## A. ABUSE OF PROCESS

"To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v Dozorc*, 412 Mich 1, 30; 312 NW2d 585 (1981). In regard to the first element—an ulterior purpose—the plaintiff must allege more than an improper motive in properly obtaining process. *Dalley*, 287 Mich App at 322. This ulterior purpose "must be more than harassment, defamation, exposure to excessive litigation costs, or even coercion to discontinue business." *Id.* at 323 (citation and quotation marks omitted). In evaluating ulterior purpose, this Court has asked whether the "ostensible objective in the action," such as obtaining monetary damages, is of secondary importance to an ulterior purpose. *Young v Motor City Apartments Ltd*, 133 Mich App 671, 681; 350 NW2d 790 (1984). A plaintiff's complaint does not satisfy this first element if "[e]ach purpose set forth in [the] complaint *describes nothing more than objectives commonly sought by claimants who initiate lawsuits*, inter alia, to prevail over the defenses and counterclaims of the opposing party and obtain a judgment authorizing appropriate damages." *Id.* at 681-682 (emphasis added).

Concerning the second element of abuse of process—the improper use of procedure—this Court has explained that a meritorious claim will involve the use of a proper legal procedure "for a purpose collateral to the intended use of that procedure[.]" *Dalley*, 287 Mich App at 322 (citation and quotation marks omitted). The tort of abuse of process involves more than "the mere issuance of the process, because an action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Id.* (citation and quotation marks omitted).

As an example of an appropriately-pled claim for abuse of process, this Court in *Dalley* posited a situation "where the defendant utilizes discovery in a manner consistent with the rules

of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms." *Id*. (citation and quotation marks omitted). See also *Vallance v Brewbaker*, 161 Mich App 642, 646; 411 NW2d 808 (1987). In addition, this Court in *Vallance*, while summarizing the decision of *Three Lakes Ass'n v Whiting*, 75 Mich App 564; 255 NW2d 686 (1977), provided an illustrative example of a properly pled claim for abuse of process:

> abuse of process was properly pled by an allegation that the defendant offered to dismiss an action for damages without the need to pay compensation if the plaintiff would cease opposition to the development of a condominium project. The ulterior purpose of stifling opposition was collateral to the defendant's maintenance of a lawsuit for the recovery of damages as compensation. [*Vallance*, 161 Mich App at 646, citing *Three Lakes Ass'n*, 75 Mich App at 569-575.]

The parties dispute whether plaintiffs alleged acts by defendants which would constitute "process." We will assume, without deciding, that plaintiffs sufficiently alleged acts by defendants which constituted "process," both in their original complaint and in their proposed amended complaint. However, we find that both plaintiffs' original complaint and proposed amended complaint suffer from the same fatal flaw: a failure to sufficiently allege an ulterior purpose or improper use of process by defendants. Plaintiffs' complaint alleged harassment by defendants as an ulterior purpose; however, a claim for abuse of process contemplates more than mere harassment. *Dalley*, 287 Mich App at 323. Furthermore, while plaintiffs alleged that the settlement demand of $1 million in exchange for not filing the Peterer affidavit demonstrates an ulterior or collateral purpose, demanding settlement was not collateral to the maintenance of Tilmon-Jones's suit for damages. See *id*.; *Vallance*, 161 Mich App at 646 (describing a collateral/ulterior purpose). In *Young*, 133 Mich App at 679, the plaintiffs' claim for abuse of process was premised, in part, on allegations that the defendants, in an earlier action, sought to "coerce and extort" payment from the plaintiffs. This Court held that the plaintiffs in *Young* failed to plead an improper use of process designed to obtain a collateral advantage because "[e]ach purpose set forth in their amended complaint describes nothing more than objectives commonly sought by claimants who initiate lawsuits . . . ." *Id*. at 681-682.

Plaintiffs argue that the demand of $1 million can be considered a collateral purpose because it was not tied to the amount of damages claimed in the underlying lawsuits. In *Young*, this Court ruled that efforts taken to "obtain a judgment authorizing *appropriate damages*" were not enough to constitute abuse of process. *Id*. at 682. The implication of this statement from *Young*—and the theory upon which plaintiffs attempt to rely—is that demand for settlement of excessive damages not tied to the underlying claim can constitute abuse of process. The problem here, however, is plaintiffs never alleged—in their original complaint or their proposed amended complaint—how $1 million was an amount that was not "appropriate" in relation to the amount of damages sought in the underlying litigation.

Plaintiffs also argue that they alleged an improper purpose/ulterior motive because the proposed amended complaint alleged that Reed and Thennisch used process in order to "drum up" new business. This allegation was rooted in plaintiffs' allegations that defendants played a role in the publication of the news story that served as the basis for plaintiffs' defamation claim.

-6-

This does not constitute process, because any role defendants played in supplying information for the news story was an action outside of the legal proceedings, and should not be considered "abuse of process." See See *Spear v Pendill*, 164 Mich 620, 623; 130 NW 343 (1911) (explaining that the tort concerns the use of *legal process*).

This shortcoming by plaintiffs was present both in the original complaint and in the proposed amended complaint. Accordingly, we affirm the trial court's summary disposition ruling and find that the court did not abuse its discretion by denying as futile plaintiffs' motion for leave to amend the complaint.

## B. MALICIOUS PROSECUTION

In general, several Michigan cases have commented that the tort of malicious prosecution has been looked upon with disfavor. See, e.g., *Friedman*, 412 Mich at 46 ("The cure for an excess of litigation is not more litigation"); *Payton v Detroit*, 211 Mich App 375, 395; 536 NW2d 233 (1995) ("We note that [a]ctions for malicious prosecution are regarded by law with jealousy and they ought not to be favored but managed with great caution.") (citation and quotation marks omitted). A claim for malicious prosecution requires the plaintiff to plead and prove: (1) the prior proceedings terminated in favor of the plaintiff; (2) the present defendant lacked probable cause for bringing the prior proceedings; (3) the defendant in the prior proceedings acted with malice; and (4) special injury. *Friedman*, 412 Mich at 47. The last element—special injury—is at issue in this case. On the issue of special injury, our Supreme Court in *Friedman* went to great lengths to explain that, although other jurisdictions have abandoned the special injury requirement, Michigan still requires plaintiffs pleading malicious prosecution to plead and prove special injury. *Id*. at 32-33. In coming to this conclusion, the Court recognized an English common-law case from 1698 that identified three categories of special injury: "injury to one's fame (as by a scandalous allegation), injury to one's person or liberty, and injury to one's property." *Id*. at 33, citing *Savile v Roberts*, 1 Ld Raym 374, 378; 91 Eng Rep 1147, 1149-1150 (1698).

Plaintiffs' original complaint did not use the words "special injury," nor did the complaint plead anything that resembled an allegation that plaintiffs suffered a special injury. In fact, the complaint merely alleged that defendants "lacked probable cause for pursuing these proceedings" and that defendants pursued the 2006 lawsuit, the 2011 lawsuit, the Smith default, and the Tennessee proceedings "for a purpose other than to secure the proper adjudication of the claims." Because this complaint lacked any reference to special injury, summary disposition in favor of defendants on the complaint was appropriate. *Friedman*, 412 Mich at 17.

Plaintiffs' proposed amended complaint sought to rectify the pleading deficiency by adding two allegations of special injury: (1) injury to fame; and (2) special injury by way of a succession of litigation initiated by defendants. Regarding injury to fame, there is scant caselaw in Michigan describing what an injury to fame looks like. *Friedman* did not opine as to what an "injury to one's fame" would look like, although it did find that the plaintiff failed to plead a special injury in spite of the fact that he alleged a prior lawsuit had resulted in "damages to his reputation as a physician and surgeon, embarrassment and continued mental anguish." *Id*. at 19. In *Young*, 133 Mich App at 677, this Court did not identify what injury to fame would look like, but remarked that "[i]nterference with one's usual business and trade, including the loss of

goodwill, profits, business opportunities and the loss of reputation, is not cognizable as special injuries." Further, in *Barnard v Hartman*, 130 Mich App 692, 694-695; 344 NW2d 53 (1983), this Court held that alleging an injury to one's "professional reputation" was not sufficient to allege a "special injury."[6] See also *Early Detection Ctr, PC v New York Life Ins Co*, 157 Mich App 618, 627; 403 NW2d 830 (1986) (rejecting the idea that the cost of litigation, embarrassment and emotional distress, damage to reputation, and damage to the goodwill of the plaintiffs' business amounted to special injury). This Court has held that a malicious-prosecution plaintiff does not suffer special injury when the only alleged damage is that "which would ordinarily result when an action like that brought by the defendants[ ] is brought against a person in a position analogous to that of the plaintiff." *Barnard*, 130 Mich App at 696.

Based on the forgoing authority, the trial court did not abuse its discretion when it found that plaintiffs' amended complaint was futile to the extent it attempted to allege injury to fame as a special injury. Plaintiffs' allegations about injury to fame are strikingly similar to those deemed not sufficient in cases such as *Young*, *Barnard*, and *Early Detection Ctr*. For instance, plaintiffs' proposed amended complaint suggests, in a cursory manner, that the Peterer affidavit was inflammatory and irrelevant, and that this damaged plaintiffs' reputation. However, based on *Young*, *Barnard*, and *Early Detection Center, PC*, this is not enough. Moreover, although plaintiffs allege in a conclusory manner that they suffered an injury beyond what one would expect to suffer in a typical copyright action, they make no effort to identify that injury. Finally, it should be noted that plaintiffs' amended complaint attempted to lump the allegedly defamatory news story in with their allegations of injury to fame. The news story was a distinct event from the prosecution of any action by defendants, and should not be considered as part of a malicious prosecution claim. The proper avenue for pursuing claims related to the news story appear to be an action defamation; however, plaintiffs' claim for defamation, which is not before this Court in this appeal, was untimely.

Plaintiffs' next alleged that they suffered special injury from the succession of proceedings instituted by defendants. This argument is based on a single case from this Court, which appears to be somewhat of an outlier in this Court's jurisprudence. The first, and only, Michigan case explaining this "succession of proceedings" position is *Kauffman v Shefman*, 169 Mich App 829; 426 NW2d 819 (1988). In *Kauffman*, the plaintiffs argued that a "multiplicity of lawsuits" constituted abuse of process. In doing so, they relied on *Soffos v Eaton*, 152 F2d 682 (1945), a case in which the malicious-prosecution plaintiff had successfully defended against four lawsuits. *Soffos* noted that special injury was normally a requirement for a malicious-prosecution claim, but remarked that while the special injury requirement was "in accordance with generally accepted law" at one time, "it is not clearly so today." *Soffos*, 152 F2d at 683 n 3 (quotation marks omitted). Then, *Soffos* went on to state that "[t]he burden of being compelled to defend successive unconscionable suits is not one which would necessarily result in all suits prosecuted to recover for like causes of action." *Id*. at 683. Accordingly, *Soffos* held that "one

---

[6] *Barnard* even questioned whether *Friedman* intended to eliminate injury to fame as a type of special injury. *Barnard*, 130 Mich App at 696.

who twice sues another maliciously and without probable cause is responsible to him in damages." *Id*.

Returning to this Court's decision in *Kauffman*, the panel cited *Soffos*, and then explained that "[t]he courts of this state have never considered the issue whether a succession of lawsuits in and of itself can constitute a special injury for purposes of a malicious prosecution action." *Id*. at 838-839. The *Kauffman* panel then remarked that this Court's decision in *Barnard*—which required a malicious-prosecution plaintiff to suffer some type of injury that would not necessarily occur in suits for similar causes of action—sounded like the justification set forth in *Soffos* for adopting the "succession of lawsuits" theory of special injury. *Id*. at 839. With the rule from *Barnard* as a backdrop, the panel held[7] "that under some circumstances a succession of suits can in and of itself result in injury which would not necessarily occur in similar litigation." *Id*. The rule was based on the expectations of the party who successfully defended the prior suit: "[a] party who reasonably expects to have obtained his peace with another from the outcome of an initial lawsuit brought by the other suffers a special injury where he is forced a second time to litigate the same dispute, or another dispute contrived for some improper purpose." *Id*.

We begin our analysis of plaintiffs' claims in the instant case by noting that the decision in *Kauffman* appears to be an extension of the law of malicious prosecution, as a "succession of lawsuits" does not fit neatly within the three categories of "special injury"—injury to fame, injury to one's person, and injury to one's property—set forth in *Friedman*. An extension of the law, it must be added, that is based on *Soffos*, a case from another jurisdiction that was skeptical of the "special injury" requirement. And, it is an extension that does not appear to have been adopted by any Michigan cases subsequent to *Kauffman*. Finally, *Kauffman* is a pre-1990 case, and we could conclude that we are not required to follow *Kauffman*. MCR 7.215(J)(1).

In addition, we note that plaintiffs in the instant case are essentially asking this Court to extend *Kauffman* even further. This we will not do. Upon examining the various proceedings initiated by defendants in the instant case, it is not apparent that the instant facts involve a repetition of the same lawsuit. For instance, plaintiffs first take issue with the fact that defendants attempted to revisit the 2007 settlement; plaintiffs attempt to use this as part of the alleged "succession." We cannot conclude that these efforts amounted to malicious prosecution, as parties to settlements occasionally, based on fraud or other avenues, attempt to revisit

---

[7] Any assertion by defendants that the "succession of suits" language from *Kauffman* is dicta is meritless. The panel in *Kauffman*, 169 Mich App at 839, expressly held that succession of lawsuits could constitute special injury: "*we hold* that under some circumstances a succession of suits can in and of itself result in injury which would not necessarily occur in similar litigation." (Emphasis added). As further evidence that this assertion was not dicta, the panel in *Kauffman* noted that another deficiency in the plaintiffs' complaint in that case *could have been fatal* to the claim and that the plaintiffs could have amended their complaint to cure that deficiency. However, the panel remarked that its "ruling on the special injury requirement," i.e., the ruling that, although a succession of lawsuits could constitute special injury, there was no such special injury in this case, "would make such amendment futile." *Id*. at 832 n 1.

settlement agreements. Arming one who successfully defends against an allegation of fraud in procuring a settlement with a claim for malicious prosecution could discourage defrauded parties from seeking to invalidate settlements. In other words, one who settles a matter cannot reasonably expect that the settlement will not thereafter be challenged for any reason. See *Kauffman*, 169 Mich App at 840-841 (citing a party's "reasonable expectation").

Examining the remainder of the actions initiated by defendants leads to a similar problem in applying *Kauffman*. For instance, rather than repeatedly suing plaintiffs as occurred in *Soffos*, defendants sought to reopen matters to which Tilmon-Jones was not a party in order to assert whatever supposed rights Tilmon-Jones had in those matters. While her actions were repeatedly determined to be frivolous, this is different than simply filing the same lawsuit over and over again. Thus, the instant case does not appear to fit the fact pattern of *Kauffman* or *Soffos*, the case upon which *Kauffman* relied. At least to some degree, some of the actions could be considered different, as they involved different copyright claims; claims that were nevertheless barred by the settlement and release, however. See *Kauffman*, 169 Mich App at 841 (finding that the succession of litigation rule did not apply when the suits were "two separate causes of action."). Finally, it should be noted that defendants were sanctioned at each and every turn for their conduct.[8] It is difficult to contemplate what would be the special injury suffered by plaintiffs in light of the sanctions they were awarded. As defendants point out, the issue of sanctions was not discussed in *Kauffman*. We conclude that the trial court did not abuse its discretion when it denied plaintiffs' motion for leave to amend.

Affirmed. This Court's stay is lifted and the matter is remanded to the trial court for further proceedings not inconsistent with this opinion with respect to any remaining matters before the trial court. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Jane M. Beckering

---

[8] Thennisch contends that plaintiffs have received more than $150,000 in monetary sanction awards from defendants.