# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF STUART ALISTER WARNER.

TAMARA WARNER,

      Petitioner-Appellee,

v

BRAD TREVOR WARNER,

      Respondent-Appellant.

UNPUBLISHED
February 15, 2018

No. 337596
Calhoun Probate Court
LC No. 2013-000548-DA

Before: RONAYNE KRAUSE, P.J., and FORT HOOD and O'BRIEN, JJ.

PER CURIAM.

Respondent Brad Trevor Warner[1] appeals as of right from the probate court's order granting summary disposition in favor of petitioner Tamara Warner in this dispute over the estate of respondent's father and petitioner's husband, Stuart Alister Warner (the decedent). We affirm.

## I. BACKGROUND

The decedent died on June 1, 2013 in his home located at 203 Kings Lane in Battle Creek, Michigan. The decedent had three children: respondent, Brian Warner and Brooke Barksdale. At the time of his death, the decedent was married to petitioner. On June 11, 2013, petitioner filed an application for informal probate, and/or appointment of personal representative. In the application, petitioner stated that "[t]he decedent died intestate, and after exercising reasonable diligence, I am unaware of any unrevoked testamentary instrument relating to property located in this state[.]" On June 13, 2013, letters of authority were issued naming

---

[1] While respondent filed a petition and amended petition seeking probate of the decedent's alleged will, the lower court proceedings were initiated by petitioner filing a petition for informal probate and seeking to be named personal representative. Respondent was listed as an heir on petitioner's petition. Accordingly, throughout this opinion, Brad Trevor Warner will be referred to as respondent, and Tamara Warner as petitioner.

-1-

petitioner as the personal representative of the decedent's estate. The amended inventory filed in this case reflects that the estate includes the decedent's home, valued at $128,300 after taking into consideration a $25,350 mortgage. The estate also includes a 2010 Lincoln MKS valued at $18,000, a 1996 Chevrolet Blazer valued at $1,800, a credit union account valued at $5,104 and miscellaneous household furniture and personal effects valued at $1,000, for a total value of the estate of $154,204.00.

On September 5, 2013, respondent, proceeding in propria persona,[2] filed a petition seeking probate of the decedent's estate, noting that the decedent's will is "lost, destroyed or otherwise unavailable at this time." The petition sought appointment of Brooke Barksdale as the personal representative of the decedent's estate. Following the probate court's ruling on several discovery-related and other procedural motions on July 7, 2014, on July 28, 2014, respondent filed an amended petition alleging multiple other supplemental claims. After petitioner moved for summary disposition and respondent filed a response, the probate court granted petitioner's motion, concluding that genuine issues of material fact did not exist concerning the execution of the alleged will in compliance with Michigan law, or with regard to the alleged will's contents. Notably, a copy of the alleged will was not produced in the probate court or this Court. Respondent now appeals as of right.

## II. ANALYSIS

On appeal, respondent argues that the probate court erred in granting summary disposition in favor of petitioner pursuant to MCR 2.116(C)(10) where genuine issues of material fact existed regarding (1) whether the alleged will in this case was executed in compliance with Michigan law and (2) the contents of the alleged will. We disagree.

This Court reviews de novo a probate court's decision regarding a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In *Auto-Owners Ins Co v Campbell-Durocher Group Painting & Gen Contracting, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket Nos. 331384, 331389, 331802, 331803), slip op at 5, this Court stated, in pertinent part, as follows:

> We review de novo a trial court's decision on a motion for summary disposition. . . . Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party. [Citations and quotation marks omitted.]

### A. RESPONDENT'S CLAIM SEEKING PROBATE OF THE ALLEGED WILL

---

[2] Respondent is proceeding in propria persona in this Court.

This case is governed by the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* As this Court recognized in *In re Estate of Attia*, 317 Mich App 705, 709; 895 NW2d 564 (2016), quoting MCL 700.1201(b), "[t]he provisions in EPIC are to be construed liberally and applied to promote its purposes and policies, including '[t]o discover and make effective a decedent's intent in distribution of the decedent's property.'"

Article III of EPIC governs the procedure to probate a will in the probate court. MCL 700.3402 provides, in pertinent part, as follows:

(1) A petition for formal probate of a will or for adjudication of intestacy with or without request for appointment of a personal representative must be directed to the court, must request a judicial order after notice and hearing, and must contain the statements required by this section. A petition for formal probate of a will must include all of the following:

\* \* \*

(c) A statement as to whether the original of the decedent's last will is in the court's possession or accompanies the petition. *If the original will is not in the court's possession or neither the original will nor an authenticated copy of a will probated in another jurisdiction accompanies the petition, the petition must also state the will's contents and shall indicate that the will is lost, destroyed, or otherwise unavailable.* [Emphasis added.]

MCL 700.3407 provides, in pertinent part, as follows:

(1) All of the following apply in a contested case:

(b) *A proponent of a will has the burden of establishing prima facie proof of due execution in all cases* and, if the proponent is also a petitioner, prima facie proof of death and venue. [Emphasis added.]

At issue in this case is whether the probate court correctly concluded that genuine issues of material fact did not exist with regard to whether the alleged will of the decedent was duly executed in accordance with Michigan law. Article II of EPIC contains statutory provisions governing wills in Michigan. For example, MCL 700.2502 sets forth the general requirements for a will to be valid pursuant to Michigan law.

(1) Except as provided in subsection (2) and in [MCL 700.2503, MCL 700.2506, and MCL 700.2513], a will is valid only if it is all of the following:

(a) In writing.

(b) Signed by the testator or in the testator's name by some other individual in the testator's conscious presence and by the testator's direction.

(c) Signed by at least 2 individuals, each of whom signed within a reasonable time after he or she witnessed either the signing of the will as described in subdivision

-3-

(b) or the testator's acknowledgment of that signature or acknowledgment of the will.

(2) *A will that does not comply with subsection (1) is valid as a holographic will, whether or not witnessed, if it is dated, and if the testator's signature and the document's material portions are in the testator's handwriting.*

(3) Intent that the document constitutes a testator's will can be established by extrinsic evidence, including, for a holographic will, portions of the document that are not in the testator's handwriting. [MCL 700.2502 (emphasis added; footnote omitted).]

In determining that genuine issues of material fact to withstand summary disposition did not exist, the probate court, reviewing the record evidence in the light most favorable to respondent, noted the complete "paucity" of evidence that would support a finding that the alleged will was executed pursuant to the requirements of Michigan law. The probate court's determination was legally sound and well-grounded in a close review of the record evidence.

Turning to the record evidence, in support of his response to petitioner's motion for summary disposition, respondent presented his own August 8, 2013 affidavit, in which he averred, in pertinent part, that "[the decedent] told me that he had a will prepared and executed to insure [sic] that something like [what happened to the decedent when his own father died] would never happen to [the decedent's children] when he died."[3] Respondent further averred, in pertinent part, as follows:

11. I know that my father continued to have a will up until the time I last spoke with him because he would bring up the fact that he had one during conversations with me.

12. My father specifically told me that Brian Warner and Brooke Barksdale were named as beneficiaries of his will.

13. I do not know specifically how my father intended to distribute his assets or in what proportions, but he did mention that he was leaving his house to one of my siblings.

* * *

15. Despite the fact that I personally have not spoken with my father in approximately two years, I personally believe that my father had a valid and

---

[3] Throughout the lower court proceedings it was suggested that the decedent undertook to execute an estate plan to avoid the situation that allegedly transpired when his own father died without an estate plan in place.

properly executed will at the time of his death because of what he had to go through when his father died.

Respondent further alleged that, on the basis of information that he received from family members and friends of the decedent, "[the decedent] had a valid, unrevoked will at the time of his death[,]" and Brooke Barksdale was nominated as the executor of this will, and the personal representative of the estate. Respondent further claimed that the decedent's will "specifically designated the manner and proportions in which he chose to distribute his assets at the time of his death to persons whom he designated as devisees[,]" and that Brian Warner and Brooke Barksdale were named as devisees in the decedent's will. Finally, respondent alleged that petitioner was well-aware that the decedent had executed a will, and that petitioner had rebuffed any attempts by the decedent's children to discuss his estate.

Additionally, respondent presented the February 14, 2014 affidavit of Brian William Warner. In his affidavit, Brian Warner averred that shortly after Brian Warner's grandfather, the decedent's father, died in 2005, the decedent informed him that he had executed his own will. According to Brian Warner, the decedent also spoke to Brian Warner's ex-wife, Rebecca Nolan, several times about the decedent's will, and the last time that the decedent spoke to Brian Warner about the alleged will was approximately 18 months before the decedent passed away. Brian Warner also specifically averred, in pertinent part:

14. [The decedent] specifically told me on numerous occasions, of which the last was approximately two-and-a-half to three years ago, that he specified in his will that he was leaving: (a) his house located at 203 Kings Lane to me and my wife, Rebecca, (b) all of his guns to me and my sister, Brooke, (c) an unspecified amount of cash to my sister, Brooke, and (d) an unspecified amount of cash to all of his grandchildren, including my wife Rebecca's children.

15. [Petitioner] was aware of the fact that [the decedent] had a will and has at least some knowledge of the will's contents.

16. I know that [petitioner] had knowledge of the will because [petitioner] was present during some of the conversations I had with [the decedent] about his will.

17. About three-and-a-half years ago, while we were speaking on [the decedent's] front porch, [petitioner] specifically told me that [the decedent's] will was leaving my wife Rebecca and I his house on 203 Kings Lane in the form of a quit claim deed.

Brian Warner also specifically recalled a conversation where he, petitioner and Brooke Barksdale were meeting with the family's pastor, Reverend Gary Siefert, following the decedent's death and discussing whether the decedent's body should be cremated, during which petitioner conceded that she was aware that the decedent had a will. Brian Warner also noted a meeting that he had with petitioner at a local restaurant following the decedent's death, where petitioner acknowledged that she thought the decedent had a will, but that she had looked for it "everywhere[,]" including in the decedent's gun safe, but that she could not find it. According to

Brian Warner, petitioner "then indicated that she was going to make it up to all of us and take care of us the way our father would have wanted, although she was unclear as to what she meant by this."

Likewise, respondent presented the February 11, 2014 affidavit of Brooke Barksdale in support of his response to petitioner's motion for summary disposition. In her affidavit, Brooke Barksdale averred that "[a]t some point after my grandfather's death, [the decedent] told me that he was making a will, which was motivated by his own father's situation . . . ." Brooke Barksdale specifically averred, in pertinent part, as follows:

15. In the summer of 2006, [the decedent] sat me down in his office at 203 Kings Lane and showed me some documents, which included his last will and testament.

16. [The decedent] specifically indicated that the will he was showing me was intended to distribute his personal property and to deal with other matters according to his express wishes at the time of his death.

17. [The decedent] explained to me that, in his passing, he knew he could trust me to take care of his estate.

18. He then had me sign some documents and write down my social security number.

19. [The decedent] told me that my signatures on those documents would make me the executor of his estate when he died and power-of-attorney to make decisions on his behalf in the event that he ever becomes unable to make decisions for himself.

20. After I signed these papers, [the decedent] placed all the documents he had shown me in his gun safe on the top shelf.

21. For the past ten years or more, [the decedent] has had this gun safe in his office located next to his bedroom.

22. As long as [the decedent] has been in possession of this gun safe, he has kept all of his guns and personal papers contained therein.

23. [The decedent] was a very organized person, and he generally followed his own established routines and habits without much change.

24. As a matter of routine and habit, [the decedent] always kept his gun safe locked unless he was retrieving something from it or placing something into it.

25. [The decedent] spoke to me about his will on many different occasions.

26. [The decedent] told me on numerous occasions that he had specified in his will that my brother, Brian Warner, would get his house located at 203 Kings Lane and that I would be the executor of his estate.

27. [Petitioner] was aware of the fact that [the decedent] had a will and has at least some knowledge of the will's contents.

28. I know that [petitioner] had knowledge of the will because [petitioner] was present during some of the conversations I had with [the decedent] about his will, and she specifically told me that she knew about the will *after* [the decedent] had died.

Respondent also included in support of his response to petitioner's motion for summary disposition the November 30, 2013 affidavit of Eric Warner. Eric is a first cousin of the decedent, and recalled that following the decedent's father's death, the decedent told him that he "intended to have a will drafted[,]" because he did not want his own estate to end up as his father's had. According to Eric Warner, the decedent subsequently "made references to me about having a will on multiple occasions." In her February 17, 2014 affidavit, the decedent's former daughter-in-law, Rebecca Nolan, averred that while married to her ex-husband, Brian Warner, the decedent, on an unspecified date, informed her and Brian Warner that the decedent had a will.

9. [The decedent] specifically told me that he specified in his will that Brian and I were going to inherit his house located at 203 Kings Lane and that each of my children were going to inherit money for college.

10. [Petitioner] was aware of the fact that [the decedent] had a will and has at least some knowledge of the will's contents.

11. I know that [petitioner] has knowledge of the will because [petitioner] was present during a conversation Brian and I had with [the decedent] several years ago about his will, and [petitioner] seemed upset that she was not named as executor or a major beneficiary.

A review of the record evidence, in the light most favorable to respondent, reveals that the probate court correctly concluded that genuine issues of material fact did not exist concerning whether an alleged will was duly executed in accordance with Michigan law. As the probate court recognized, the affidavits of respondent, Brian Warner, Rebecca Nolan, Eric Warner and Brooke Barksdale, while detailed in their recollection about what the decedent told them about his alleged will, do not contain any information relevant to the execution of the alleged will. Notably, there is nothing in the record to suggest when the decedent executed the alleged will, whether it was witnessed, drafted by an attorney, or simply prepared in his own handwriting as permitted by MCL 700.2502(2). Additionally, although Brooke Barksdale stated that the decedent "showed" her his "last will and testament[,]" there is nothing in her affidavit to support a conclusion that the alleged will complied with the requirements of MCL 700.2502(1)(a)-(c), which requires a document to be in writing, signed by the decedent, or by another person in the decedent's presence and at his direction[,] and signed by at least two witnesses. Moreover, the

record evidence does not support a conclusion that the alleged will was a valid holographic will, where there is no record evidence, even from Brooke Barksdale, the witness who had the closest interaction with the decedent about his alleged will, that the document was dated, contained the decedent's signature, and that the "material portions [were] in the [decedent's] handwriting." MCL 700.2502(2).

On appeal, as in the probate court, respondent contends that the alleged will should be treated as if it did comply with the execution requirements of MCL 700.2502 where it meets the requirements of MCL 700.2503. This statute provides, in pertinent part:

> Although a document or writing added upon a document was not executed in compliance with [MCL 700.2502] the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute any of the following:

> (a) The decedent's will.

Given the complete lack of evidence concerning whether the alleged will met the requirements of MCL 700.2502, the applicability of MCL 700.2503 on the facts of this case is dubious indeed, and in our view demonstrates an attempt by respondent to avoid the statutory requirement that an alleged will, even one lost or destroyed, must be established to have been executed in accordance with Michigan law. See MCL 700.3407(1)(b) ("A proponent of a will has the burden of establishing prima facie proof *of due execution in all cases*[.]" Additionally, MCL 700.2503 requires that a proponent of a "document or writing" establish by "clear and convincing evidence" that the decedent intended "the document or writing" to constitute his will. MCL 700.2503(a). In the instant case, while respondent presented ample record evidence concerning alleged statements that that the decedent made to others concerning the existence of an alleged will, and how he intended to distribute his estate, no document or writing has been presented to the probate court or this Court from which the reasonable conclusion could be drawn, on the basis of clear and convincing evidence, that the decedent intended that specific document or writing to be his will. Thus, the probate court properly determined that the record evidence, viewed in the light most favorable to respondent, did not yield genuine issues of material fact concerning whether the alleged will was properly executed in compliance with the applicable provisions of Michigan law.

The probate court also correctly determined that the record evidence did not yield genuine issues of material fact concerning the contents of the alleged will. MCL 700.3402(1)(c). As noted above, when seeking to probate a lost or destroyed will, a petition "must also state the will's contents." As a general matter, the affidavits respondent presented in support of his response to petitioner's motion for summary disposition contain each witness's recollection regarding what the decedent allegedly told them about how he planned to distribute his estate. For example, Brian Warner averred that the decedent told him that in his will, he was leaving his home to Brian Warner and Rebecca Nolan, his guns to Brian Warner and Brooke Barksdale, and undisclosed amounts of money to Brooke Barksdale and to the decedent's grandchildren. Brooke Barksdale further averred that the decedent told her that the decedent's will provided that Brian Warner would receive the decedent's home following his death. In her affidavit, Rebecca

Nolan provided this same information, noting that the decedent had also told her that the decedent's will provided that she and Brian Warner would receive the decedent's home, and that her children would receive monetary funds for their college education. However, even viewing this evidence in the light most favorable to respondent, this information can best be characterized as general statements concerning the decedent's intentions to distribute his property and effects. Put another way, as noted above, there is nothing in the record to confirm when and how the alleged will was executed, and the general information provided by respondent, Brian Warner, Brooke Barksdale, Rebecca Nolan and Eric Warner regarding the decedent's alleged statements concerning his personal property simply does not shed any light on the specific contents of the alleged will at issue. Thus, the probate court properly granted summary disposition in favor of petitioner pursuant to MCR 2.116(C)(10).

## B. SUPPLEMENTAL CLAIMS REGARDING THE ALLEGED WILL

In his brief on appeal, respondent also contends that the probate court erred in granting summary disposition of several counts he alleged in his amended petition seeking probate of the decedent's will in the probate court. Specifically, according to respondent, genuine issues of material fact existed to warrant trial on the following multiple counts related to his overall theory that petitioner intentionally withheld or destroyed the decedent's will. These include Count I (malicious destruction of the alleged will by petitioner); Count III (petitioner's neglect of her duty to forward the decedent's will to the probate court in violation of MCL 700.2516); Count IV (petitioner's fraudulent concealment of material facts regarding the existence, execution and contents of the decedent's will); Count V (fraudulent misrepresentation of facts by petitioner in a probate court proceeding); Counts XVI and XVII (petitioner intentionally and improperly interfered with the testamentary expectancies of other individuals).

With regard to respondent's claims of (1) malicious destruction of a will by petitioner, (2) petitioner's breach of duty imposed pursuant to MCL 700.2516, and (3) fraudulent concealment by petitioner of facts regarding the existence, content and execution of the decedent's will, respondent acknowledges in his brief on appeal that all three claims would require proof that the decedent's will was in existence. However, as we have analyzed in detail above, a thorough review of the record simply does not yield genuine issues of material fact to support a trier of fact in concluding that the decedent executed a will in compliance with Michigan law. Therefore, it logically follows that genuine issues of material fact would also not exist with regard to these supplementary claims alleged in the amended petition seeking probate of the alleged will.

Moreover, with respect to petitioner's alleged fraudulent misrepresentation of material facts in the probate proceeding, respondent contends that petitioner "failed to disclose a material fact about the existence, execution or contents of [the decedent's] will[.]" "Common-law fraud or fraudulent misrepresentation entails a defendant making a false representation of material fact with the intention that the plaintiff would rely on it, the defendant either knowing at the time that the representation was false or making it with reckless disregard for its accuracy, and the plaintiff actually relying on the representation and suffering damage as a result." *Barclae v Zarb*, 300 Mich App 455, 476; 834 NW2d 100 (2013). Again, as analyzed above, while multiple witnesses testified generally that (1) the decedent told them that he had a will, or (2) that petitioner acknowledged knowing that the decedent had executed a will, the record was devoid of evidence

actually confirming that the decedent indeed executed a valid will in compliance with Michigan law. Therefore, respondent is hard-pressed to assert that petitioner made false representations concerning the existence, execution or contents of the will, given that there is no evidence that the will existed. Accordingly, summary disposition on this count was properly granted.

Addressing respondent's claims that petitioner interfered with Brian Warner's, and the remaining heirs' "testamentary expectancy" with regard to the alleged will, as respondent acknowledges, such a claim would require proof of "a valid . . . expectancy[,]" and "knowledge of the . . . expectancy on the part of the defendant[.]" *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 323; 788 NW2d 679 (2010). Where the record evidence does not support the reasonable conclusion that a valid will executed in accordance with the dictates of Michigan law existed, genuine issues of material fact cannot be said to exist with regard to whether Brian Warner or any of the other heirs to the decedent's estate had a valid expectancy arising from the alleged will. Thus, summary disposition was properly granted with respect to this count.

## C. SUPPLEMENTAL CLAIMS RELATING TO PETITIONER'S INVENTORY OF THE ESTATE

Respondent also claims that genuine issues of material fact existed on several claims relating to how petitioner conducted her inventory of the decedent's estate, and therefore the probate court ought not have granted summary disposition pursuant to MCR 2.116(C)(10). These additional claims include Count VI (fraudulent misrepresentation of the decedent's assets); Count VII (fraudulent concealment of the decedent's assets); Count IX (neglect by petitioner of her duty to prepare an inventory in compliance with MCL 700.3706(1)) and Count XI (neglect of petitioner's duty to prepare an amended or supplemental inventory pursuant to MCL 700.3708).

As this Court, interpreting the predecessor legislation to EPIC, recognized in *McTaggart v Lindsey*, 202 Mich App 612, 617; 509 NW2d 881 (1993):

> The personal representative is a fiduciary of the estate who is charged with settling and distributing the estate. The personal representative must use his authority in the best interest of the estate and in the interests of the parties. A fiduciary stands in a position of confidence and trust with respect to the heirs. [Citations omitted.]

See also MCL 700.3703 (recognizing that the personal representative of an estate "is a fiduciary who shall observe the standard of care applicable to a trustee as described by [MCL 700.7803].")

In support of his claims, respondent points to the affidavits of Brooke Barksdale and Brian Warner. In her February 11, 2014 affidavit, Brooke Barksdale averred that where petitioner listed several of the items in the inventory of the estate as being acquired jointly by petitioner and the decedent, such information "is simply not true." In his affidavit, Brian Warner also noted that where petitioner had included in the inventory of the estate several items, representing that they were jointly acquired by both her and the decedent, such a representation was "simply not true." In her inventory of personal items belonging to the decedent's estate, petitioner included, among other things, numerous pieces of household furniture, a gas grill, a

gun safe, a freezer, a riding lawn mower and a leaf blower. Petitioner also included three firearms in the inventory of personal items. According to both Brian Warner and Brooke Barksdale, petitioner excluded from the inventory of the estate several items. Specifically, Brian Warner averred as follows:

> At a minimum, I know for certain that my father owned the following items of personal property, and had them in his possession, at the time of his death: (a) 50+ inch flat-screen television with a value of over $1,500, (b) personal computer, (c) an expensive digital camera, (d) golf clubs, (e) a new microwave, (f) a new refrigerator, (g) tools, (h) a workbench, (i) jewelry, including three gold rings and a couple of gold necklaces, (j) several medals, (k) several model airplanes, (l) stereo system and speakers, (m) many war related books, (n) clothing, linens, and many other housing and living accessories, (o) 7 mm Walter PPK pistol, and (p) many family photos and other family memorabilia, among other things.

Brooke Barksdale also averred that the decedent had in his possession at his death a bed and plane tickets for a trip to Belize, and that these items were not included in petitioner's inventory of the estate.

Even accepting respondent's contention that there are discrepancies in the personal inventory of the estate, respondent has not pointed to any record evidence suggesting that petitioner acted fraudulently to misrepresent or conceal the household effects that formed part of the estate, or that she neglected her fiduciary duty to prepare an inventory for the estate, or an amended inventory, in compliance with MCL 700.3706 or MCL 700.3708. MCL 700.3706 requires that a personal representative "prepare an inventory of property owned by the decedent at the time of death, listing it with reasonable detail[.]" Likewise, MCL 700.3708 states, in pertinent part, as follows:

> If property not included in the original inventory comes to the knowledge of a personal representative or if the personal representative learns that the value or description indicated in the original inventory for an item is erroneous or misleading, the personal representative shall make a supplementary inventory or appraisal showing the market value as of the date of the decedent's death of the new item or the revised market value or description, and showing the appraiser or other data relied upon, if any.

Again, viewing the record evidence in the light most favorable to respondent, and even accepting his argument that petitioner did not include in the inventory and amended inventory for the estate certain items that allegedly belonged to the decedent, there is nothing in the record to suggest that petitioner intentionally abdicated her fiduciary duty to complete an accurate inventory pursuant to MCL 700.3706 or MCL 700.3708 or that she acted negligently in preparing the inventory. Accordingly, the probate court properly granted summary disposition

with respect to the supplemental claims respondent alleged with respect to the estate's inventory.[4]

## III. DISCOVERY

On appeal, respondent claims that the probate court abused its discretion in denying his motion to compel discovery and his motion for a protective order to specify terms and conditions of depositions and in granting petitioner's motion for a protective order. We disagree.

This Court reviews for an abuse of discretion the probate court's decision regarding whether to compel discovery. *Sarkar v Doe*, 318 Mich App 156, 167; 897 NW2d 207 (2016). This Court will also review for an abuse of discretion the probate court's determination regarding whether to grant a protective order. *Dep't of Health & Human Servs v Genesee Circuit Judge*, 318 Mich App 395, 407; 899 NW2d 57 (2016). "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Cassidy v Cassidy*, 318 Mich App 463, 479; 899 NW2d 65 (2017).

In *Fette v Peters Constr Co*, 310 Mich App 535, 548; 871 NW2d 877 (2015), this Court set forth the following principles of law concerning the discovery process in Michigan.

> Michigan follows a policy of open and broad discovery. Parties are permitted discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending case. *Despite this broad discovery policy, courts are empowered to limit excessive, abusive, or irrelevant discovery requests.* Under MCR 2.302(C), a party may move the trial court for a protective order to disallow discovery[.] [*Fette*, 310 Mich App at 548 (citations and quotation marks omitted; emphasis added).]

MCR 2.313(A) provides that "[a] party, on reasonable notice to other parties and all persons affected, may apply for an order compelling discovery[.]" Additionally, MCR 2.313(A)(1) and (2) specify the appropriate procedure for a party to follow when the opposing party does not answer an interrogatory submitted pursuant to MCR 2.309, or allow for an inspection pursuant to MCR 2.310. Pursuant to MCR 2.313(A)(3), where the court denies a motion to compel discovery, "in whole or in part," the court may also issue a protective order that could have been sought pursuant to MCR 2.302(C). MCR 2.302(C) governs the issuance of a protective order and provides, in pertinent part, as follows:

> **(C) Protective Orders**. On motion by a party or by the person from whom discovery is sought, and on reasonable notice and for good cause shown, the court in which the action is pending may issue any order that justice requires to protect

---

[4] While the probate court employed different reasoning in dismissing the supplemental claims, this Court will nonetheless affirm the lower court's decision if the correct result was reached. *Scherer v Hellstrom*, 270 Mich App 458, 464; 716 NW2d 307 (2006).

a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following orders:

(1) that the discovery not be had;

In both his brief in support of his motion to compel discovery in the probate court and his brief on appeal in this Court, respondent contends that the following information is relevant to the issues in the instant case: (1) information concerning the decedent's and petitioner's finances from three years before the decedent's death to the time of the motion to compel, (2) information regarding the decedent's health, (3) information regarding the petitioner's criminal history, (4) information concerning the friends of the decedent and petitioner, (5) a complete inventory of the decedent's belongings, (6) written and electronic information regarding the decedent's will, legal matters, marital issues between the decedent and petitioner, as well as regarding any health or mental health issues or substance abuse issues of petitioner, (7) information regarding any internet searches that the decedent or petitioner undertook, as well as (8) further information relevant to incomplete answers that respondent alleges petitioner gave in her discovery responses.

In the instant case, even accepting respondent's detailed contentions in both his motion to compel and his brief on appeal that the information he requested was relevant to issues in the lower court proceedings and was "reasonably calculated to lead to the discovery of admissible evidence[,]"[5] MCR 2.302(B)(1), the probate court clearly acknowledged in its ruling from the bench that its decision to grant petitioner's motion for a protective order and to "suspend any additional discovery[,]" was motivated by the court's concern that unnecessary expenses arising from future discovery would "create[ ] an undue burden on the estate." In so ruling, the probate court noted that it had reviewed respondent's motion to compel, and that "[v]irtually all of the information" that respondent sought to acquire in the motion to compel pertained to issues that the probate court had dispensed with in addressing and granting other motions at issue in the case, including respondent's request, granted by the probate court, that the administration of the estate be supervised by the probate court. The probate court decided to grant respondent's motion seeking to supervise the estate given the nature of the serious allegations against petitioner.

In ruling on respondent's motion to compel, petitioner's motion seeking a protective order, as well as respondent's motion seeking a protective order regarding the taking of depositions, the probate court also recognized that respondent had already served petitioner with interrogatories, requests for production of documents, and that respondent had supported his response to the motion for summary disposition with multiple affidavits from potential witnesses in this case. These detailed and voluminous affidavits clearly supported respondent's theory of the case, particularly his allegation that petitioner knew of the existence of an alleged will, and took steps to destroy or withhold the alleged will. For example, Brian Warner averred in his February 14, 2014 affidavit that the decedent had kept all of his important and personal papers in his gun safe, and that he was a very organized person. Brian Warner also stated that the day the

---

[5] We have closely reviewed the discovery requests at issue and petitioner's responses.

decedent died, June 1, 2013, he and Brooke Barksdale visited the decedent's home between 12 p.m. and 1 p.m., and he noticed that the decedent's gun safe was open, which struck him as odd because the decedent always kept the gun safe locked. Brian Warner also recalled a conversation where he, Brooke Barksdale, petitioner and the family's pastor were present, and petitioner acknowledged that she was aware of the decedent having a will. According to Brian Warner, in a subsequent conversation, petitioner told him she had searched everywhere for the decedent's will, to no avail.

In her February 11, 2014 affidavit, Brooke Barksdale noted that when she arrived at the decedent's home at approximately 11 a.m. on the day of the decedent's death, petitioner's son, Shawn, tried to stop her as Brooke Barksdale went to see the decedent's body, and when she looked in the decedent's pants pocket for his car keys, which also contained the keys to the gun safe, she could not find them. Brooke Barksdale also averred that the decedent had put his will in the gun safe. When Brooke Barksdale tried to search the decedent's home further for the keys, petitioner told her to leave the home. According to Brooke Barksdale, "[petitioner] hid my father's keys because she knew the whereabouts and contents of my father's will and intended to withhold and suppress his will from probate to the extent possible." Brooke Barksdale also stated that petitioner refused to allow an autopsy to be conducted of the decedent's body. Like Brian Warner, Brooke Barksdale noted that petitioner was aware of the existence of the alleged will, where she had been present during conversations Brooke Barksdale had with the decedent about his will. Brooke Barksdale also recalled that the decedent and petitioner were having marital problems about one week before the decedent's death, and that he was planning to file for divorce once Brooke Barksdale returned from her deployment for the military overseas.

Eric Warner also averred in his November 13, 2013 affidavit that the decedent and petitioner were having marital troubles in the time leading to the decedent's death, and that the decedent had told him that he had a will before he died. Likewise, Rebecca Nolan averred in her February 17, 2014 affidavit that petitioner had expressed her frustration in Rebecca Nolan's presence that petitioner was not named as an executor of the decedent's alleged will. Conversely, in her December 16, 2013 answers to respondent's interrogatories, petitioner denied ever telling anyone that the decedent had executed a will or other testamentary document before his death. Specifically, petitioner stated, "to the best of my knowledge, [the decedent] did not have a Will, Codicil or other testamentary document."

We agree with the probate court's conclusion that a protective order was necessary where additional discovery to support respondent's theory that an alleged will existed, and that petitioner played a role in its loss or destruction, would be not only repetitive but also unnecessary given the existing detailed and voluminous record evidence already presented to support these allegations. Put another way, the probate court's reasoning and ultimate order to cease the discovery process clearly reflects the probate court's intention to prevent "undue burden or expense" to the estate and "excessive" discovery on legal theories that were already amply supported by the record evidence. This Court has recognized that "a trial court is within its discretion to limit discovery when it becomes excessive or abusive." *Chastain v Gen Motors Corp*, 254 Mich App 576, 593; 657 NW2d 804 (2002). Additionally, the probate court's decision complied with the requirements of MCR 2.302(C)(1), and where its reasoning confirms that its ultimate decision fell within the principled range of outcomes, *Cassidy*, 318 Mich App at 479, the probate court's decision did not amount to an abuse of discretion.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien